UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MONOCOQUE DIVERSIFIED INTERESTS, LLC,

                Plaintiff,

-against-

AQUILA AIR CAPITAL (IRELAND) DAC,

                Defendant.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/17/2023

22-cv-10015 (MKV)

OPINION & ORDER DENYING MOTION FOR PRELIMINARY INJUNCITON

MARY KAY VYSKOCIL, United States District Judge:

Before the Court is the motion of Plaintiff Monocoque Diversified Interests, LLC for a mandatory preliminary injunction against Defendant Aquila Air Capital (Ireland) DAC. For the reasons set forth below, the motion for preliminary relief is DENIED.

## I.     BACKGROUND[1]

Plaintiff Monocoque Diversified Interests, LLC ("MDI") is a consulting firm that has been operating in the aviation business for about 15 years. *See* Keyes Aff. ¶ 5. It facilitates the purchase, sale, leasing, and servicing of "mid-life" (*i.e.* used) airplanes and airplane parts, such as engines. *See* Keyes Aff. ¶¶ 3–5; Tr. at 27:3–21. Aquila Air Capital (Ireland) DAC ("Aquila") is a relatively new aviation company that buys and leases airplanes and engines. *See* Tr. at 31:3–6;

---

[1] The Background reflects the Court's findings of fact pursuant to Rule 65 of the Federal Rules of Civil Procedure. As explained below, the Court granted MDI's requests for expedited discovery and an evidentiary hearing in advance of the Court's ruling on MDI's motion for a preliminary injunction. The Court's factual findings are based on: (1) the affidavits and exhibits the parties submitted, after taking discovery, as exhibits in support of their briefs [ECF Nos. 28-1 ("Keyes Aff."). 28-2 ("Services Agreement"), 28-3, 28-4, 28-5, 28-6, 28-7, 28-8 ("Notice of Termination"), 28-9 ("Audit Demand"), 28-10 ("Response to Audit Demand"), 28-11 ("KPMG and Deloitte Emails"), 28-12, 28-13 ("August 15, 2022 Letters to Lessees"), 28-14 ("Sky One Letter to MDI"), 28-15; ECF No. 30]; (2) the evidence admitted at the evidentiary hearing [ECF No. 39 ("Tr.")]; and (3) the proposed findings of fact and conclusions of law the parties submitted after the evidentiary hearing [ECF No. 37 ("Aquila Proposed Findings and Conclusions"); ECF No. 38 ("MDI Proposed Findings and Conclusions")].

1

Services Agreement at 1. MDI and Aquila entered into a "Services Agreement" on August 25, 2021 [ECF No. 28-2 ("Services Agreement")]. MDI Proposed Findings and Conclusions ¶ 1; Aquila Proposed Findings and Conclusions ¶ 1; Tr. 28: 14–15.

A. <u>Services Agreement</u>

As relevant to the motion for a preliminary injunction, the Services Agreement provides that MDI will identify and negotiate opportunities for Aquila to buy and lease airplanes and engines, referred to as "the Equipment." Services Agreement at 1; *see* Services Agreement § 1. In return, in addition to a consultancy fee, MDI is entitled to a small percentage of the "acquisition price" of the Equipment and the money Aquila makes from leasing or selling the Equipment. Services Agreement § 3. An attachment to the Services Agreement states that MDI will invoice lessees for payments [ECF No. 28-2 at 16].

In the section on fees and expenses, the Services Agreement provides: "Consultant shall have the right no more than once per calendar year to engage a mutually agreed third party auditing firm to audit the Company's books and records in respect of the Equipment at Consultant's sole cost and expense." Services Agreement § 3(a).

The Services Agreement also contains a section entitled "Interference with Business Opportunities."[2] It provides that, during the consultancy period and for a period of time thereafter,

---

[2] In full, Section 6(b) provides: During the term of this Agreement and for a period of two (2) years after termination of this Agreement, (i) the Consultant agrees that the Consultant shall not divert or attempt to divert from the Company any business of any kind related to the Equipment, including but not limited to the solicitation of or interference with any of its suppliers, engine vendors, lessees or customers related to the Equipment, and (ii) each party agrees and acknowledges that the other party would suffer substantial damage if either party was to interfere with any relationships with its clients, financial partners or employees, and that it would be extremely difficult or impracticable to ascertain the actual amount of damages to either party if a Customer were to divert either party's business opportunities or to employ one of the other party's employees in violation hereof. Therefore, Company and Consultant agree that as of the Effective Date, and continuing during the Consultancy Period and for one (1) year thereafter: (x) neither party shall use any Confidential Information to solicit or otherwise provide services to a customer or financial partner of the other party, that are in competition with the services provided by either party; and (y) neither party shall interfere with any employment relationships or hire, solicit or attempt to induce any of the other party's employees to leave their employment.

MDI "shall not divert" any business away from Aquila; "neither party shall use any Confidential Information to solicit or otherwise provide services to a customer or financial partner of the other party, that are in competition with the services provided by either party"; and "neither party shall interfere" with the employment relationships of (*e.g.*, attempt to hire employees away from) the other party.  Services Agreement § 6(b).  The contract also states that both parties agree "the other party would suffer substantial damage" that would be "extremely difficult or impracticable to ascertain" if "either party was to interfere with any relationships with its clients, financial partners or employees."  Services Agreement § 6(b)(ii).

The Services Agreement provides that Aquila can terminate the consultancy without cause by giving MDI 60 days' "prior written notice."  Services Agreement § 2(b)(iii).  There is no dispute that the Services Agreement remains in force during those 60 days.  Aquila remains liable for fees that would otherwise be due during the period of the consultancy.  And "the Company and the Consultant shall work to establish an orderly transition" to end Aquila's use of MDI's services.  Services Agreement § 2(b)(iii).

B. <u>Aquila Terminates MDI and Notifies Lessees</u>

On August 15, 2022, Aquila sent MDI a Notice of Termination without cause.  *See* Notice of Termination; MDI Proposed Findings and Conclusions ¶ 20.  The parties agree that the termination became effective on—and the Service Agreement remained in force until—October 14, 2022.  *See* MDI Proposed Findings and Conclusions ¶ 21; Tr. at 35:22–23 (counsel for Aquila agreeing that "[t]he contract was terminated as of October 14, 2022").  Indeed, Aquila's Notice of Termination so states.  Notice of Termination at 1.

On August 15, 2022, Aquila also sent letters to lessees of the Equipment, including Delta Air Lines, Inc. and Sky One, stating that Aquila "has terminated its servicing relationship with

3

[MDI] and will be taking over all servicing responsibilities itself effective immediately" [ECF No. 28-13 ("August 15, 2022 Letters to Lessees")]. The letters direct the lessees to "communicate" with Aquila, instead of MDI, going forward.

C. MDI Demands an Audit

On October 12, 2022, MDI sent Aquila a letter stating that MDI "has engaged a forensic accounting firm, Weaver, to conduct an initial audit of Aquila books and records in respect of the Equipment" [ECF No. 28-9 ("Audit Demand")]. MDI also included a pamphlet about Weaver and a spreadsheet listing all of the information it was requesting from Aquila.

On October 14, 2022, Aquila responded that Aquila would "of course comply with the request for an audit," but MDI's "unilateral engagement of an auditor" and the proposed scope of the audit were "both improper" [ECF No. 28-10 ("Response to Audit Demand")]. Aquila stated that would agree to an audit by KPMG, Ernst & Young, PwC, or Deloitte. MDI represents that all four of these firms refused the engagement [ECF No. 28-11]; Tr. at 12:1–3.

D. Procedural History

MDI initiated this case on November 23, 2022 by filing a Complaint [ECF No. 1], a motion for a preliminary injunction [ECF Nos. 4, 5], and a motion for expedited discovery and a hearing on its motion for a preliminary injunction [ECF Nos. 6, 7].

On December 5, 2022, the Court issued an Order granting in part and denying in part MDI's motion for expedited discovery [ECF No. 13 ("Order")]. The Court wrote that, based on MDI's submissions, the Court understood MDI to be seeking expedited discovery in order to develop the record in advance of an evidentiary hearing on MDI's motion for a preliminary injunction. The Court explained:

> Plaintiff alleges that Defendant is "interfering with MDI's contractual right to audit Aquila's books and records" and is "interfering with MDI's business relationships."

4

> Plaintiff seeks expedited discovery of: "(i) financial and other information maintained by Aquila relating to Equipment acquired by Aquila (as defined in the August 25, 2021 Services Agreement between the parties) that includes, but is not limited to liabilities, expenses, proceeds, and net profits related thereto; or alternatively, access to Aquila's books and records as required by the Service Agreement to enable MDI to promptly conduct an appropriate audit; (ii) documents demonstrating the status of certain Equipment originated by MDI pursuant to the Services Agreement; (iii) documents relating to certain transactions between Aquila and key MDI business partners; and (iv) the deposition of Aquila's corporate representative subject to reasonable time and subject matter limitations."

Order at 1–2 (internal citations omitted).

The Court explained that it would grant expedited discovery only insofar as the proposed discovery "would better enable the court to judge" the proposed preliminary injunction. Order at 2 (quoting *In re Keurig Green Mountain Single-serve Coffee Antitrust Litig.*, 2014 WL 12959675, at *2 (S.D.N.Y. July 23, 2014)). The Court explained that, as the Court understood the circumstances of this case, it was unlikely that MDI could show that it would suffer irreparable harm absent a preliminary injunction as a result of any breach of the contractual right to audit Aquila's books and records. As such, since evidence of the alleged breach likely would not change the Court's ruling on the motion for a preliminary injunction, the Court denied much of the requested expedited discovery. Order at 4.

However, the Court explained, interference with business relationships can constitute irreparable harm. Order at 4; *see also Rex Med. L.P. v. Angiotech Pharms. (US), Inc.*, 754 F. Supp. 2d 616, 621 (S.D.N.Y. 2010) (quoting *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004). As such, the Court ruled that MDI could take expedited discovery with respect to "documents relating to certain transactions between Aquila and key MDI business partners," and it could depose Defendant's corporate representative about the alleged interference with MDI's business relationships. Order at 4.

The Court directed the parties to complete the expedited discovery by January 31, 2023, to file any further briefing at the beginning between February 7 and February 14, 2023, and to appear for a hearing on February 23, 2023.  Order at 5.  MDI filed a new memorandum of law in support of its motion for a preliminary injunction [ECF No. 28 ("MDI Mem.")].  Aquila filed an opposition [ECF No. 29 ("Opp.")].

The Court held an evidentiary hearing on the motion for a preliminary injunction on February 23, 2023 [ECF No. 39 ("Tr.")].  MDI's counsel was unprepared in several respects.  For example, MDI's counsel began his presentation by announcing his intention "to put on, by deposition, . . . the entity representative of Aquila" on the ground that the witness was "unavailable."  Tr. at 3:21–4:17.  However, MDI's counsel did not provide any basis for the Court to make a finding that the witness was unavailable.  On the contrary, MDI's counsel admitted that he had not subpoenaed the witness or even asked defense counsel to make the witness available to testify.  Tr. at 4:11–25.

Moreover, showing a lack of basic professionalism, MDI's counsel failed to bring enough copies of his exhibits to the hearing.  So, once MDI's counsel handed an exhibit to the Court, he no longer had access to the exhibit when he needed to respond to an objection, show it to his witness, and otherwise present his case.  *See, e.g.*, Tr. at 20:25–21:9 (asking the Court to give back the copy of the Services Agreement MDI had offered into evidence when the Court asked a question about the document in response to an objection); 24:23–25:15 (borrowing a copy of his own exhibit from defense counsel); 43:13–22.

The only witness at the hearing was Mary Alice Keyes, the manager of MDI.[3]  Ignoring numerous warnings from the Court, Ms. Keyes persistently offered testimony beyond the scope of

---

[3] MDI also sought to offer the testimony of a representative of Weaver, Mr. Padilla, only "to prove his qualifications" to perform the audit, but the Court ruled that it did "not need to hear from him on that."  Tr. at 81:18–25.

6

the question before her.  It was clear from Mr. Keyes' testimony that she was motivated to present a certain narrative.[4]  Because Ms. Keyes was unable to confine her testimony to responsive, factual answers, she did not impress the Court as an entirely credible witness.

On March 6, 2023, MDI and Aquila each filed proposed findings of fact and conclusions of law [ECF No. 38 ("Aquila's Proposed Findings and Conclusions"); ECF No. 38 ("MDI's Proposed Findings and Conclusions")].  The next day, MDI filed a letter objecting to Aquila's Proposed Findings and Conclusions on that ground that it contained arguments, in addition to proposed findings of fact and conclusions of law [ECF No. 41].  MDI requested that the Court either strike the argumentative portion of Aquila's Proposed Findings, or permit MDI to file a supplemental brief.  The parties have also filed a number of other submissions that are not relevant to the pending motion for a preliminary injunction.

## II. LEGAL STANDARD

A preliminary injunction "is an extraordinary and drastic remedy," and the movant has the burden.  *Moore v. Consol. Edison Co.*, 409 F.3d 506, 510 (2d Cir. 2005).  To obtain a preliminary injunction, the movant must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of equities tips in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of an

---

[4] As the Court pointed out on the record at the evidentiary hearing, counsel for MDI "is a percipient witness" in this case because he participated in drafting the Services Agreement. Tr. at 9:15, 55:16–18.  This problem was underscored when counsel for MDI repeatedly attempted to introduce, including through Ms. Keyes, evidence of MDI's unilateral intent in drafting the Services Agreement, notwithstanding its argument that the contract is unambiguous. *See, e.g.*, Tr. at 32:1–14.

7

injunction. *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015); *See* Fed. R. Civ. P. 65(a).

To show a likelihood of irreparable harm, the movant must demonstrate that "absent a preliminary injunction [it] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009). It is fundamental that the movant cannot show a likelihood of irreparable injury, and a court may not issue preliminary relief, where the alleged injury is a breach of contract that can be compensated by money damages. *See Petereit v. S.B. Thomas, Inc.*, 63 F.3d 1169, 1186 (2d Cir. 1995); *Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979).

Where the movant seeks a mandatory injunction, which alters the status quo by commanding a positive act, the burden is even higher, and the movant must show that it is clearly entitled to the relief it requests, or extreme damage will result from denial of preliminary relief. *Tom Doherty Associates, Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 34 (2d Cir. 1995). And where a court does issue an injunction, the relief must be "narrowly tailored to fit specific legal violations and to avoid unnecessary burdens on lawful commercial activity." *Faiveley*, 559 F.3d at 119 (quoting *Waldman Pub. Corp. v. Landoll, Inc.*, 43 F.3d 775, 785 (2d Cir. 1994)).

### III.   DISCUSSION

MDI argues that: (1) Aquila has not paid MDI everything Aquila owes MDI under the Services Agreement; (2) Aquila has breached the Services Agreement by refusing to participate in an audit; and (3) Aquila has breached the Services Agreement by interfering with MDI's business relationships. MDI specifically contends that it is aware of two sales for which MDI would be entitled to payments that Aquila improperly reclassified as "deposits," rather than sales revenue,

in order to avoid paying MDI. MDI Mem at 8. MDI argues that it needs a far-reaching audit not only to discover what MDI is owed, but also to "discover the identity [sic] of all of the parties to whom the 'termination' letters were sent or with who [sic] Aquila had verbal communications regarding MDI and the reason for the termination notice." MDI Mem. 7–8. MDI proposes an intrusive preliminary injunction ordering Aquila both to: (1) submit now to the audit by MDI's chosen auditor, Weaver; and (2) refrain from doing any business with a long list of aviation entities, as well as refrain from making "any negative statements about MDI or its principals to anyone in the aviation industry" [ECF No. 28-16]. However, MDI cannot show a likelihood of success on the merits, cannot show a likelihood of irreparable harm absent preliminary relief, and is not entitled to the intrusive relief it requests.

    A.  <u>The Alleged Interference with MDI's Business Relationships</u>

MDI contends that Aquila interfered with MDI's business relationships and harmed its reputation. *See* MDI Mem. at 8, 10–14. The only evidence MDI has offered to support this contention is the letters Aquila sent to lessees on August 15, 2022, stating that Aquila had "terminated its servicing relationship" with MDI and would be "taking over all servicing responsibilities itself effective immediately" [ECF No. 28-13]. The letters also directed lessees to communicate with Aquila, instead of MDI, going forward.

Although it was technically inaccurate on August 15, 2022 to state that Aquila had *already* terminated the relationship, since the Services Agreement remained in force until October 14, 2022, the letters that MDI has introduced into evidence do not, in any way, support the conclusion that Aquila interfered with MDI's relationships or reputation. In MDI's Proposed Findings and Conclusions, MDI asks the Court to find that the letters "implie[d] that the termination was for

9

cause." MDI's Proposed Findings and Conclusions ¶ 27. But the letters simply do not say or imply anything about the reason for the termination.

At the evidentiary hearing, MDI attempted to show that Aquila had disparaged MDI and thus damaged its reputation among businesses in the aviation industry with whom MDI had previous relationships. But the only evidence MDI presented in this vein was testimony from Ms. Keyes that, beginning "after the termination," MDI's business relationships and revenue changed for the worse. Tr. 46:18. Ms. Keyes specifically testified that MDI had previous relationships with Delta and Sky One, but, since August 2022, MDI is "not in contact with [Delta] as actively," and has received only one proposal from Delta for "assets that are not as attractive," and Sky One "do not talk to [MDI] anymore." Tr. at 41:11–25. This testimony is obviously insufficient to establish that Aquila did anything improper.

Aquila was entitled under the Services Agreement both to terminate its relationship with MDI without cause and to take steps to assure an "orderly transition" away from the use of MDI's services. Services Agreement § 2(b)(iii). As noted above, an addendum to the Services Agreement provided that MDI would invoice Aquila's lessees for payments [ECF No. 28-2 at 16]. Aquila needed to inform lessees that it would no longer be working with MDI. Perhaps other companies chose to reconsider their relationships with MDI after they learned that Aquila had chosen to terminate its relationship with MDI, but any causal connection between Aquila's August 15, 2022 Letters to Lessees and the decline of MDI's business is purely speculative. More importantly, MDI has not offered a shred of evidence that Aquila has disparaged MDI or has done anything improper to damage MDI's relationships.

Moreover, it is not entirely clear that MDI can even state a claim for breach of the Services Agreement based on mere allegations that Aquila disparaged or diverted business opportunities

away from MDI.  The "Interference with Business Opportunities" section of the Services Agreement provides that (1) *MDI* "shall not divert" any business away from Aquila; (2) "neither party shall use any *Confidential Information* to solicit or otherwise provide services to a customer or financial partner of the other party, that are in competition with the services provided by either party"; and (3) "neither party shall interfere" with the *employment relationships* of the other party.  Services Agreement § 6(b) (emphases added).  The contract also states that both parties "acknowledge[]" that "the other party would suffer substantial damage" that would be "extremely difficult or impracticable to ascertain" if "either party was to interfere with any relationships with its clients, financial partners or employees."  Services Agreement § 6(b)(ii).

Thus, the Services Agreement imposes a general obligation on MDI "not [to] divert" any business away from Aquila.  It also prohibits Aquila from using confidential information to solicit business away from MDI.  But it is not entirely clear that the Services Agreement imposes on Aquila a general obligation not to disparage or divert business away from MDI using non-confidential information.  Perhaps the *acknowledgment* that it would cause damage if "either party was to interfere with any relationships" could be construed as imposing such an obligation on Aquila.  But the other clauses in the "Interference with Business Opportunities" section of the Services Agreement are clearly phrased as obligations (MDI "shall not" and "neither party shall"), and the use of "materially different" language suggests the acknowledgment clause has a different meaning.  Antonin Scalia & Bryan A. Garner, Reading Law 170 (2012).

MDI does not even argue, let alone offer evidence, that Aquila used confidential information to solicit MDI's customers or financial partners.  Indeed, Aquila represents that, during the expedited discovery, Aquila requested documents identifying any alleged confidential information that Aquila purportedly used, and MDI responded that it was unable to produce

11

responsive documents after a diligent search. *See* Tr. at 14:15–21; *see also* Tr. at 60:4 – 5 (MDI's counsel stating, "We are not relying on [the confidential information] part" of the Interference with Business Opportunities section). Since MDI may not even be able to state a claim for breach without alleging that Aquila used confidential information, and MDI does not argue or offer evidence that Aquila did use confidential information, MDI has not shown a likelihood of success on the merits of its claim for breach of the Interference with Business Opportunities section of the Services Agreement.

Furthermore, while a company's loss of reputation, good will, and business opportunities from a breach of contract *can* constitute irreparable harm, MDI has not established a likelihood of irreparable harm here. Rather, the Second Circuit has explained that, to constitute irreparable harm, the loss of reputation, good will, and business opportunities must threaten "the very viability of the business." *Tom Doherty Associates*, 60 F.3d at 38. The Second Circuit has found no irreparable harm where "the alleged loss of goodwill was doubtful, and lost profits . . . could be compensated with money damages determined on the basis of past sales of that product and of current and expected future market conditions." *Id.* Here, the only evidence of lost good will and lost profits is the testimony of Ms. Keyes described above and an affidavit in which she states that MDI "has not received the formal and informal offers to submit proposals that it has historically enjoyed" since Aquila sent the August 15, 2022 letters [ECF No. 28-1 ("Keyes Aff.") ¶ 12]. This evidence does not establish a threat to the very viability of MDI.[5]

---

[5] At the evidentiary hearing, in the context of discussing the demand for a forensic audit, counsel for MDI asserted, for the first time, that MDI faces irreparable harm because "the company may fail before the company can recover [the money Aquila allegedly owes MDI]." Tr. at 57:19–24. However, counsel's assertion that MDI is in a dire financial situation is not evidence, and his statement certainly is not evidence that MDI's viability is threated by Aquila's alleged interference with MDI's business opportunities.

The Court also notes that the scope of the relief MDI requests is out of all proportion to any alleged injury. MDI asks the Court to enjoin Aquila from doing any business with numerous companies and to enjoin Aquila from making "any negative comments" about MDI and its principals. Even if MDI could show a likelihood of success and irreparable harm, MDI's proposed preliminary injunction is untenable. *See Waldman Publ. Corp. v. Landoll, Inc.*, 43 F.3d 775, 785 (2d Cir. 1994) (injunctive relief must be "narrowly tailored to fit specific legal violations" and "should not impose unnecessary burdens on lawful activity").

B. The Alleged Breach of the Audit Provision

MDI has not shown a likelihood of success on the merits of its claim that Aquila has breached MDI's contractual right to audit Aquila's books and records. Even if MDI can show a likelihood of success on the merits, it cannot show a likelihood of irreparable harm absent *preliminary* relief. In all events, MDI is not entitled to use its proposed audit as a means of conducting discovery in this lawsuit.

There is no dispute that the Services Agreement creates an audit right. Tr. at 15:6–9. MDI contends that Aquila has breached the audit provision of the Services Agreement because MDI has demanded an audit, but no audit has taken place. However, the audit provision states: "Consultant shall have the right no more than once per calendar year *to engage a mutually agreed third party auditing firm* to audit the Company's books and records in respect of the Equipment at Consultant's sole cost and expense." Services Agreement § 3(a). Here, MDI unilaterally engaged Weaver, and Aquila did not agree.

Aquila advised MDI that it would agree to an audit by KPMG, Ernst & Young, PwC, or Deloitte. MDI represents that all four of these firms refused the engagement [ECF No. 28-11]. Tr. at 12:1–3. But Aquila is not obligated to agree to an audit by Weaver merely because the four

13

firms it previously mentioned have, according to MDI, refused to perform the audit. Aquila represents that it would agree to "any number of [other] auditors." Tr. at 16:4–6. MDI and Aquila needed to "mutually agree[]" to a different firm. Services Agreement § 3(a); *see* Tr. at 12: 4–5. MDI has not shown a likelihood of success on the merits of its claim for breach of the audit provision of the Services Agreement merely because Aquila did not agree to an audit by MDI's unilaterally chosen auditor.

In any event, it seems unlikely that the parties will reach agreement on an auditor unless and until MDI backs down from its demand for a grossly overbroad audit. *See* Tr. at 16 (counsel for MDI explaining that the parties are at an impasse about the proposed scope of the audit). MDI demands a forensic audit. Aquila maintains that a forensic audit clearly exceeds the scope of the audit right under the Services Agreement. At the hearing on the preliminary injunction, counsel for Aquila explained that, in Aquila's view, "[n]o forensic team at any of these firms is . . . going to take this audit, that's not what they do, they uncover criminal activity. That's not what this is about." Tr. at 16:16–18.

While the question of the precise scope of any eventual audit is not ripe for decision, the Court agrees with Aquila that MDI's proposed forensic audit exceeds the scope of the audit right under the Services Agreement. In a section entitled "Origination and Consultancy Fee and Expenses," the Services Agreement provides: "Consultant shall have the right no more than once per calendar year to engage a mutually agreed third party auditing firm to audit the Company's books and records *in respect of the Equipment* at Consultant's sole cost and expense." Services Agreement § 3(a) (emphasis added). Reading this provision in context, it is clear that MDI has a right to Aquila's books and records only to determine what Aquila has done with the Equipment that might entitle MDI to fees.

MDI maintains that it needs a forensic audit because Aquila has allegedly sent MDI financial reports that failed to include two sales for which MDI would be entitled to payment. *See* MDI Mem. at 8. Assuming these allegations are true, they still do not justify an intrusive forensic audit that includes "regulatory filings, tax filings, [and] employee handbooks that don't exist." Tr. at 15:20–21 [ECF Nos. 28-9, 28-10]. The parties should work together to engage an auditor to perform an audit within the scope of the audit right under the Services Agreement. If they cannot agree, the Court will dictate the scope of the audit at the conclusion of this case.

## IV. CONCLUSION

For the reasons set forth above, the motion of MDI for a preliminary injunction [ECF No. 4] is DENIED. The request of MDI to strike from the record, or file a further brief in response to, the argumentative portion of Aquila's Proposed Findings of Fact and Conclusions of Law [ECF No. 41] is also DENIED.

The Clerk of Court respectfully is requested to terminate the motions pending at docket entries 4 and 41.

**SO ORDERED.**

Date: **March 17, 2023**  
**New York, NY**

**MARY KAY VYSKOCIL**  
**United States District Judge**