UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___3/27/2024___

MONOCOQUE DIVERSIFIED INTERESTS, LLC,

                              Plaintiff,

        -against-

AQUILA AIR CAPITAL (IRELAND) DAC,

                              Defendant.

22-cv-10015 (MKV)

OPINION & ORDER
GRANTING IN PART
AND
DENYING IN PART
MOTION TO DISMISS

MARY KAY VYSKOCIL, United States District Judge:

Before the Court is the motion of Defendant Aquila Air Capital (Ireland) DAC ("Aquila") to dismiss the Amended Complaint of Plaintiff Monocoque Diversified Interests, LLC ("MDI"). For the reasons set forth below, the motion is GRANTED in part and DENIED in part.

## I.        BACKGROUND[1]

Monocoque Diversified Interests, LLC ("MDI") is a small consulting firm that advises companies on the acquisition, leasing, and disposition of aircraft, aircraft engines, and other aircraft assets.  AC ¶ 7.  MDI also has "expertise in managing aircraft, aircraft engines and other aircraft assets for companies and provides equipment technical services."  AC ¶ 7.  Aquila Air Capital (Ireland) DAC ("Aquila") is a company that acquires, leases, and sells aircraft, aircraft engines, and other aircraft assets.  AC ¶ 8.

---

[1] The facts are taken from the Amended Complaint [ECF No. 74 ("AC")] and are accepted as true for purposes of this motion.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The Court also relies on the documents attached to the Amended Complaint, including the Services Agreement [ECF No. 74-1] and the "addenda" [ECF No. 74-2].  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).  In addition, the Court relies on the letters that Aquila sent to lessees notifying them of the termination of the relationship between MDI and Aquila [ECF No. 28-13 (the "Letters")].  The Letters are not attached to the Amended Complaint, but MDI has previously submitted them to the Court, the Amended Complaint references them numerous times, and the Letters are "integral" to the Amended Complaint.  *Chambers*, 282 F.3d 147 (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)).

A.  <u>**The Services Agreement and the Addenda**</u>

MDI and Aquila executed a "Services Agreement" on August 25, 2021 [ECF No. 74-1 ("Services Agreement")], pursuant to which Aquila engaged MDI to consult on Aquila's "acquisition and management of" certain aircraft assets.  AC ¶ 9; *see* Services Agreement at 1. Specifically, the Services Agreement identifies "up to eleven (11) airframes, up to twenty-four (24) aircraft engines, and a Residco Engine," referred to collectively as the "Equipment."  AC ¶ 9; *see* Services Agreement at 1.

The Services Agreement provides that MDI is entitled to various payments, tied to either Aquila's acquisition of the Equipment, or monthly proceeds from or sales of the Equipment.  *See* Services Agreement §§ 3(a), 3(b), 3(c), 3(d).  Specifically, the Services Agreement provides for an "Origination Fee," a monthly "Consultancy Fee," a monthly "Profit Participation Percentage," a "Monetization Fee," and an "Airframe/Engine Set Up Fee and Advance."  AC ¶¶ 12–16; *see* Services Agreement §§ 3(a), 3(b), 3(c), 3(d).  The Services Agreement states that the Origination Fee, for example, "shall be paid to [MDI] upon delivery to [Aquila] of an item of Equipment." Services Agreement § 3(a).  The Monetization Fee, on the other hand, is tied to a "sale by [Aquila] during the term of" the Services Agreement.  Services Agreement § 3(c).  The monthly Profit Participation Percentage is tied to "all . . . proceeds" and paid at a given time each month "during the term of th[e] Agreement."  Services Agreement § 3(a).

In the section on fees and expenses, the Services Agreement provides: "[MDI] shall have the right no more than once per calendar year to engage a mutually agreed third party auditing firm to audit [Aquila's] books and records in respect of the Equipment at [MDI's] sole cost and expense."  Services Agreement § 3(a).

The Services Agreement also contains a section entitled "Interference with Business Opportunities."  Services Agreement § 6(b).[2]  It provides that, during the "Consultancy Period" and for a period of time thereafter: MDI "shall not divert" any business away from Aquila; "neither party shall use Confidential Information to solicit or otherwise provide services to a customer or financial partner of the other party"; and "neither party shall interfere" with the employment relationships of the other party.  Services Agreement § 6(b).

The Services Agreement also states that each party "acknowledges" that "the other party would suffer substantial damage" that would be "extremely difficult or impracticable to ascertain" if "either party was to interfere with any relationships with its clients, financial partners or employees."  Services Agreement § 6(b)(ii).

The Services Agreement also provides that Aquila may terminate the consultancy without cause by giving MDI sixty days "prior written notice."  Services Agreement § 2(b)(iii).  The Services Agreement remains in force during those sixty days, and Aquila remains liable for fees that would otherwise be due during the period of the consultancy.  *Id.*  The Services Agreement

---

[2] In full, Section 6(b) provides:

> During the term of this Agreement and for a period of two (2) years after termination of this Agreement, (i) the Consultant agrees that the Consultant shall not divert or attempt to divert from the Company any business of any kind related to the Equipment, including but not limited to the solicitation of or interference with any of its suppliers, engine vendors, lessees or customers related to the Equipment, and (ii) each party agrees and acknowledges that the other party would suffer substantial damage if either party was to interfere with any relationships with its clients, financial partners or employees, and that it would be extremely difficult or impracticable to ascertain the actual amount of damages to either party if a Customer were to divert either party's business opportunities or to employ one of the other party's employees in violation hereof. Therefore, Company and Consultant agree that as of the Effective Date, and continuing during the Consultancy Period and for one (1) year thereafter: (x) neither party shall use any Confidential Information to solicit or otherwise provide services to a customer or financial partner of the other party, that are in competition with the services provided by either party; and (y) neither party shall interfere with any employment relationships or hire, solicit or attempt to induce any of the other party's employees to leave their employment.

Services Agreement § 6(b).

further provides that "the Company and the Consultant shall work to establish an orderly transition" to end the relationship.  Services Agreement § 2(b)(iii).

There are "addenda" to the Services Agreement concerning "additional equipment" that MDI identified for Aquila to acquire [ECF No. 74-2].  AC ¶ 11.  Three are pertinent to this motion: "Addendum No. 2," concerning two "Gakona Engines"; "Addendum No. 3," concerning another "Gakona Engine"; and "Addendum No. 5," concerning a "Jetran Engine" [ECF No. 74-2 at 5–7, 8–10, 14–16].  These three addenda are "not signed."  AC ¶ 36.

Notably, the addenda concerning the Gakona Engines state that Aquila "will not pay [MDI] any Origination Fee" for the acquisition of those engines.  Addendum No. 2 § 2(a); Addendum No. 3 § 2(a).  The addendum concerning the Jetran Engine does require Aquila to pay an Origination Fee "for the acquisition[] of the Jetran Engine.  Addendum No. 5 § 2(a).  All three unsigned addenda provide that Aquila must pay MDI a Monetization Fee "[u]pon the sale by [Aquila] during the term of the Services Agreement" of engines in question.  Addendum No. 2 § 2(c); Addendum No. 3 § 2(c); Addendum No. 5 § 2(c).  All three addenda also provide that the monthly Consultancy Fee and Profit Participation Percentage "set forth in . . . the Services Agreement" also apply to the Gakona Engines and Jetran Engine.  Addendum No. 2 §§ 2(a), 2(b); Addendum No. 3 §§ 2(a), 2(b); Addendum No. 5 §§ 2(a), 2(b).

### B.  **The Termination and Communications about the Termination**

On August 15, 2022, Aquila sent MDI a Notice of Termination [ECF No. 74-3 ("Notice of Termination")].  AC ¶ 20.  The termination thus became effective on, and the Services Agreement remained in force until, October 14, 2022.  AC ¶ 20; *see* Notice of Termination.

"On the same day" that it sent the Notice of Termination, August 15, 2022, Aquila also sent "10 to 15 letters" to lessees of the Equipment "informing them of the termination of the Services

Agreement" with MDI.  AC ¶¶ 42, 87.  These letters are not attached to the Amended Complaint, but MDI has previously submitted them to the Court [ECF No. 28-13 (the "Letters")], the Amended Complaint references them numerous times, and they are integral to the Amended Complaint.

The Letters state that Aquila "has terminated its servicing relationship with [MDI] and will be taking over all servicing responsibilities itself effective immediately" [ECF No. 28-13].  The Letters direct lessees to "communicate" with Aquila, instead of MDI, about "servicing related matters" going forward [ECF No. 28-13].  MDI alleges that Aquila "followed up" on each letter "by telephone." AC ¶¶ 42, 87.

MDI alleges that, prior to these communications, Aquila "held a planning session to determine what would be said" to the recipients, whom MDI characterizes as "MDI's customers." AC ¶ 43.  MDI specifically alleges that it "had a business relationship with each entity."  AC ¶ 90. MDI also contends that the Letters "mischaracteriz[ed] the relationship" between MDI and Aquila and "suggest[ed] that MDI had done something wrong."  AC ¶ 42.  MDI does not offer any allegations about the substance of the alleged telephone communications beyond asserting that the calls were "to discuss the termination" and were "disparaging" to MDI.  AC ¶ 42.

**C.  The Audit Demand**

"On October 12, 2022, two days before the effective date of termination," MDI sent Aquila a letter stating that MDI "had engaged" Weaver, an accounting firm, to audit Aquila's books and records. AC ¶ 21; *see* Audit Letter [ECF No. 74-4].  MDI also included a pamphlet about Weaver and a spreadsheet listing all of the information it was requesting [ECF No. 74-4].  *See* AC ¶ 21. On October 14, 2022, Aquila "rejected . . . MDI's selection and engagement of Weaver" and stated that it would "agree to an audit being conducted by KPMG, Ernst & Young, PwC, or Deloitte." AC ¶ 22.  Aquila also "objected to the scope of the audit noticed by MDI."  AC ¶ 23.

According to MDI, Aquila "failed to communicate" with the firms it proposed and "made no efforts towards the audit" otherwise. AC ¶¶ 28, 29. MDI alleges that it "contacted each of the accounting firms" Aquila proposed, and each "either declined to conduct the audit or failed to respond to MDI's inquiries." AC ¶ 29.

**D. <u>The Alleged Unpaid Fees</u>**

MDI has invoiced Aquila for more than $3.4 million in fees that Aquila allegedly owes to MDI. AC ¶ 34. The Amended Complaint does not make clear precisely what fees the $3.4 million represents. Moreover, according to MDI, it cannot determine the full amount that Aquila owes without an audit. AC ¶ 34.

MDI alleges that, on October 24, 2022, ten days after the termination became effective, "Aquila, through counsel, stated that it would not make any further payments to MDI pursuant to the Services Agreement." AC ¶ 31. MDI alleges that "[a]t the time Aquila's counsel sent such correspondence, substantial payment obligations that had accrued during the term of the Services Agreement remained due and owing to MDI." AC ¶ 31; *see* AC ¶ 33. The Amended Complaint asserts that MDI's "rights" to all fees "accrued upon" Aquila's "acquisition of the Equipment, yet deferred though the life and eventual sale or other monetization of the Equipment," AC ¶ 33, even though, as noted above, the Services Agreement expressly provides that some fees are tied to acquisitions, while other fees are tied to sales or other proceeds "during the term of" the Services Agreement only. *See* Services Agreement §§ 3(a), 3(c).

MDI further alleges that Aquila owes MDI money in connection with the engines identified in three unexecuted addenda to the Services Agreement [ECF No. 74-2]. AC ¶¶ 35, 36. According to MDI, Aquila acquired three engines from Gakona and one engine from Jetran "originated from MDI during the term of the Services Agreement." AC ¶ 35. MDI alleges that, "[i]n spite of the

fact that the addenda related to the Gakona Engines and Jetran Engine are not signed," Aquila "accepted [MDI's] performance" of those addenda "by acquiring" the engines. AC ¶¶ 36, 37. MDI further alleges that "Aquila has paid MDI Origination Fees" for the Jetran Engine but not for the Gakona engines. AC ¶ 38. Aquila has not paid unspecified "other fees" for the Jetran and Gakona engines. AC ¶ 38.

### E. Procedural History

MDI initiated this case by filing a Complaint [ECF No. 1], a motion for a preliminary injunction [ECF Nos. 4, 5], and a motion for expedited discovery and a hearing on its motion for a preliminary injunction [ECF Nos. 6, 7]. The Court granted in part and denied in part the request for expedited discovery [ECF No. 13]. In particular, the Court granted expedited discovery with respect to MDI's allegations that Aquila interfered with MDI's business relationships [ECF No. 13]. After holding an evidentiary hearing [ECF No. 39], the Court denied MDI's motion for a preliminary injunction [ECF No. 58 ("Op.")].

MDI thereafter filed its operative pleading, the Amended Complaint [ECF No. 74]. MDI attached the Services Agreement [ECF No. 74-1], the addenda [ECF No. 74-1], the Notice of Termination [ECF No. 74-3], its audit demand [ECF No. 74-4] and other documents. MDI did not attach to its Amended Complaint the Letters Aquila sent about MDI's termination [ECF No. 28-13], even though MDI incorporates those letters into its pleading by reference, "relies heavily upon [their] terms and effect,"[3] and had previously submitted them to the Court in connection with its motion for a preliminary injunction.

The Amended Complaint asserts seven claims for relief. First, MDI asserts a claim for breach of contract, alleging that Aquila breached the Services Agreement by (i) refusing to make

---

[3] *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995))

payments it owes MDI, (ii) interfering with MDI's audit right, and (iii) soliciting and interfering with MDI's business partners.  AC ¶¶ 51, 52, 53.  Second, MDI seeks a declaratory judgment.  AC ¶¶ 58–73.  Third, MDI asserts a claim for unjust enrichment on the ground that Aquila has benefited from the Equipment, the Gakona engines, and the Jetran engine but allegedly has refused to pay MDI what it owes.  AC ¶¶ 74–78.  Fourth, MDI asserts a claim for quantum meruit on the same ground.  AC ¶¶ 79–85.

For its fifth claim, MDI asserts a claim for tortious interference with business relations based on the "10 to 15 letters" and alleged follow-up calls to third parties with whom MDI had "business relationship[s]" and in which Aquila "misstated the nature of MDI's termination, as well as the nature of MDI and Aquila's relationship."  AC ¶¶ 86–93.  Sixth, MDI asserts a claim for trade disparagement based on the same allegations.  AC ¶¶ 94–98.  Seventh, MDI asserts a claim for defamation based on the same allegations.  AC ¶¶ 99–103.

Aquila moved to dismiss the Amended Complaint [ECF Nos. 75, 76 ("Def. Mem.")].  MDI opposed that motion [ECF No. 78 ("Pl. Opp.")].  Aquila filed a reply brief and a corrected version of that brief [ECF Nos. 79, 80 ("Reply")].

Throughout the life of this case, the parties have engaged in multiple rounds of acrimonious non-dispositive motion practice and letter-writing campaigns.  After denying MDI's motion for a preliminary injunction, the Court was compelled to issue a temporary restraining order directing MDI to restore Aquila's access to its own records [ECF No. 61].  Since briefing Aquila's motion to dismiss, the parties have filed cross-motions for sanctions, accusing each other of unreasonably delaying the mutual selection of an auditor [ECF Nos. 86, 87, 88, 89, 90, 94, 95, 96, 97, 98].  The Court will resolve those motions in a later order.

## II.        LEGAL STANDARD

To survive a motion to dismiss, a plaintiff must allege "sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The allegations must raise "more than a sheer possibility that a defendant has acted unlawfully." *Id.*  The Court must accept as true all factual allegations in the complaint and must draw all inferences in the plaintiff's favor. *Littlejohn v. City of New York*, 795 F.3d 297, 306 (2d Cir. 2015).  However, the Court need not accept conclusory assertions. *Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 321 (2d Cir. 2021).

On a motion to dismiss, "the complaint is deemed to include any written instrument attached to it" or "incorporated in it by reference." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)).  The Court may also consider a document if "the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Id.* (quoting *Int'l Audiotext*, 62 F.3d at 72).  Even at the pleading stage, the Court is not required to accept the truth of assertions in a pleading that are "contradicted by more specific allegations or documentary evidence." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (citing *Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 222 (2d Cir. 2004) and characterizing that precedent as "discrediting allegation[s] 'belied' by letters attached to the complaint").

## III.        ANALYSIS

### A.  MDI Fails To Plausibly Allege Claims for Defamation, Trade Disparagement, and Interference with Business Relationships.

MDI asserts three similar claims based on Aquila's communications to lessees of the Equipment about the termination of MDI.  Specifically, MDI asserts a claim for defamation, AC

¶¶ 99–103 (claim seven), a claim for trade disparagement, AC ¶¶ 94–98 (claim six), and a claim for tortious interference with business relations, AC ¶¶ 86–93 (claim five).  MDI fails to plausibly allege any of these claims.

All three claims are entirely based on precisely the same set of letters and telephone calls. As noted above, on the same day that Aquila sent MDI a Notice of Termination, Aquila also sent "10 to 15 letters" and made a follow-up call to the recipient of each letter about MDI's termination. AC ¶¶ 42, 87, 100.  MDI alleges that the recipients were "MDI's customers."  AC ¶ 43; *see* AC ¶¶ 90, 100.  MDI contends the Letters "mischaracteriz[ed] the relationship" between MDI and Aquila by implying that MDI was "a 'servicer.'"  AC ¶ 42.  MDI further contends that Aquila "suggest[ed] that MDI had done something wrong" by "failing to state that the termination was without cause and stating that the termination was effective immediately."  AC ¶ 42.  MDI does not offer specific allegations about the substance of the telephone communications.  It simply asserts that the calls were about MDI's "termination" and were "disparaging."  AC ¶ 42.

1. **Defamation**

Under New York law,[4] defamation "is defined as the making of a false statement which tends to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society."  *Foster v. Churchill*, 87 N.Y.2d 744, 751, 665 N.E.2d 153 (1996) (internal quotation marks and citations omitted).  To state a claim for defamation under New York law, a plaintiff must allege: (1) a written or spoken defamatory statement of fact concerning the plaintiff,

---

[4] Where, as here, a plaintiff invokes the Court's diversity jurisdiction to assert tort claims, the Court determines what state's substantive law to apply by looking to the choice of law principles of the forum state, which, here, is New York. *See Celle v. Filipino Rep. Enterprises Inc.*, 209 F.3d 163, 175 (2d Cir. 2000) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).  The Court need not conduct a full choice of law analysis, however, because the parties appear to agree that New York law governs MDI's claims.  *See* Def. Mem. at 8; Pl. Opp. at 12; *Celle*, 209 F.3d at 175 (parties "deemed to have consented to" the application of New York defamation law).

(2) publication to a third party, (3) fault, (4) falsity of the defamatory statement, and (5) special damages or per se actionability.  *Palin v. New York Times*, 940 F.3d 804, 809 (2d Cir. 2019); *see Stepanov v. Dow Jones & Co.*, 120 A.D.3d 28, 34, 987 N.Y.S.2d 37, 41 (1st Dep't 2014).

On a motion to dismiss, it is for the Court to decide whether the challenged statements are "reasonably susceptible of a defamatory connotation."  *Cianci v. New Times Pub. Co.*, 639 F.2d 54, 60 (2d Cir. 1980) (quoting *James v. Gannett Co., Inc.*, 40 N.Y.2d 415, 419, 386 N.Y.S.2d 871, 874, 353 N.E.2d 834, 837 (1976)); *see Davis v. Boeheim*, 24 N.Y.3d 262, 268, 22 N.E.3d 999, 1004 (2014) ("In order for the challenged statements to be susceptible of a defamatory connotation, they must come within the well established categories of actionable communications.").  "Challenged statements are not to be read in isolation, but must be perused as the average reader would against the 'whole apparent scope and intent' of the writing."  *Celle v. Filipino Rep. Enterprises Inc.*, 209 F.3d 163, 177 (2d Cir. 2000) (quoting *November v. Time Inc.*, 13 N.Y.2d 175, 244 N.Y.S.2d 309, 194 N.E.2d 126, 128 (1963)).

"Because the falsity of the statement is an element of the defamation claim, the statement's truth or substantial truth is an absolute defense."  *Stepanov*, 987 N.Y.S.2d at 41.  "Minor inaccuracies do not amount to falsity so long as the substance" or "gist" of the statement is "justified."  *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991) (internal quotation marks and citation omitted); *see Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 242–43 (2d Cir. 2017).  While New York recognizes a claim for "defamation by implication," based on "false suggestions, impressions and implications arising from otherwise truthful statements," it requires a particularly "rigorous showing that the language of the communication as a whole can be reasonably read both to impart a defamatory inference and to affirmatively suggest that the author intended or endorsed that inference."  *Stepanov*, 987 N.Y.S.2d at 44.

The Letters Aquila sent to its lessees are not "reasonably susceptible of a defamatory connotation." *Cianci*, 639 F.2d at 60.  Although MDI did not attach the Letters to the Amended Complaint, the Court considers them because they are repeatedly referenced in and "integral" to the Amended Complaint. *Chambers*, 282 F.3d at 153.  Indeed, MDI acknowledges that the Court must "read [them] as a whole."  Pl. Opp. at 14.  This is what each letter said:

> We write to inform you that the Lessor under the above referenced Lease Agreements, Aquila Air Capital (Ireland) DAC ('Aquila') has terminated its servicing relationship with Monocoque Diversified Interests, LLC ('MDI') and will be taking over all servicing responsibilities itself effective immediately.
>
> Accordingly, all future servicing related matters may be addressed to Aquila.  Rest assured this has no impact on the terms of the Lease Agreements itself or to the account to which rent is paid, only to whom you communicate with.

[ECF No. 28-13].  The letter goes on to advise the lessee whom to contact at Aquila for "technical or commercial matters" and for "payment or lease rental related matters."  Each letter concludes: "We value our relationship with" the addressee "and look forward to continuing to do business together for many years."  The Letters are all substantially identical.

The Letters do not contain "a false statement" that would "induce an evil opinion" of MDI. *Foster*, 87 N.Y.2d at 751.  The "gist" of the Letters is that Aquila was ending its relationship with MDI, which was substantially true. *Masson*, 501 U.S. at 517; *see Stepanov*, 987 N.Y.S.2d at 41. Moreover, Aquila was clearly "justified" in advising its lessees of the change. *Masson*, 501 U.S. at 517.  Indeed, the Services Agreement provides that, in the event of termination, the parties must take steps to assure an "orderly transition" away from the use of MDI's services.  Services Agreement § 2(b)(iii).

MDI complains that the Letters mischaracterized the relationship between MDI and Aquila because they described MDI only "as a 'servicer' to Aquila," even though MDI was also a consultant.  AC ¶¶ 42, 45.  However, MDI "provides equipment technical services."  AC ¶ 7.  And

Aquila engaged MDI in connection with the "management" of the Equipment.  AC ¶ 9.  The Court is required to read the statement about Aquila's "servicing relationship" with MDI [ECF No. 28-13] "against the 'whole apparent scope and intent' of the writing."  *Celle*, 209 F.3d at 177.  The apparent purpose of the Letters is to inform the lessees who to contact about "servicing related matters" for the Equipment going forward [ECF No. 28-13].  In this context, there is nothing remotely defamatory or misleading about mentioning only Aquila's servicing relationship with MDI, without also noting its consulting services.

MDI also contends that Aquila falsely suggested that "MDI had done something wrong" because the Letters stated that "the termination was effective immediately" and failed to state that the termination was without cause.  AC ¶ 42.  It was technically inaccurate on August 15, 2022 to say that Aquila "ha[d] terminated" its relationship with MDI, since the termination would not become effective for sixty days.  *See* AC ¶ 20.  However, "[m]inor inaccuracies do not amount to falsity."  *Masson*, 501 U.S. at 517.

Crucially, contrary to MDI's assertion, the Letters do not state that Aquila terminated MDI with immediate effect.  Rather, the Letters merely state that Aquila was "taking over all servicing responsibilities itself effective immediately" [ECF No. 28-13].  A such, MDI falls far short of making a "rigorous showing" that Aquila "intended or endorsed th[e] inference" that MDI was terminated for cause.  *Stepanov*, 987 N.Y.S.2d at 44.  The Letters simply do not say or imply anything about the reason for the termination.  Accordingly, MDI fails to state a claim for defamation, or for defamation by implication, based on the utterly benign letters Aquila sent its lessees about MDI's termination.  *See id.*

As noted above, MDI offers no specific allegations about the substance of the telephone calls Aquila allegedly made to follow up on the Letters.  *See* AC ¶ 42.  MDI argues that it needs

discovery on this point.  Pl. Opp. 12–13.  However, to survive a motion to dismiss and proceed to discovery, MDI must raise "more than a sheer possibility that [Aquila] has acted unlawfully." *Iqbal*, 556 U.S. at 678.  MDI's wholly conclusory assertion that the calls were "disparaging" clearly is not enough to state a claim for defamation—or any other claim for relief—based on the follow-up calls.  AC ¶ 42; *see Whiteside*, 995 F.3d at 321.

## 2. Trade Disparagement

While New York does not recognize a cause of action called "trade disparagement," AC ¶¶ 94–98, the Court, drawing all reasonable inferences in favor of MDI, construes the Amended Complaint to assert a claim for disparagement of goods, *see Littlejohn*, 795 F.3d at 306; *Ruder & Finn Inc. v. Seaboard Sur. Co.*, 52 N.Y.2d 663, 670–71, 422 N.E.2d 518 (1981).  "To recover for disparagement of goods, the plaintiff must show that the defendant published an oral, defamatory statement directed at the quality of a business's goods and must prove that the statements caused special damages."  *Fashion Boutique of Short Hills, Inc. v Fendi USA, Inc.*, 314 F3d 48, 59 (2d Cir. 2002).  As explained above, MDI fails to plausibly allege that Aquila said or implied anything disparaging about MDI.  As such, MDI fails to state a claim for disparagement of goods.  *See Fashion Boutique of Short Hills, Inc.*, 314 F3d at 59.

## 3. Tortious Interference

MDI's claim for tortious interference with business relations is duplicative of its claim for defamation because it is entirely based on the exact same statements and seeks the exact same damages, which MDI contends flow entirely from the alleged injury to its reputation.  *See* AC ¶ 92 (alleging, in the context of its tortious interference claim, that the alleged "misstatements [in the Letters] have harmed the reputation of MDI to its third-party business relations," which have since "ceased all business with MDI").  It is well established that, "under New York law, claims

'sounding in tort' are construed as 'defamation claims, not only where those causes of action seek damages only for injury to reputation, but also where the entire injury complained of by plaintiff flows from the effect on his reputation.'" *Kesner v. Dow Jones & Co., Inc.*, 515 F. Supp. 3d 149, 189–90 (S.D.N.Y. 2021) (quoting *Jain v. Sec. Indus. & Fin. Mkts. Ass'n*, 2009 WL 3166684, at *9 (S.D.N.Y. Sept. 28, 2009)); *see Lesesne v. Brimecome*, 918 F. Supp. 2d 221, 225–26 (S.D.N.Y. 2013) (collecting cases). Thus, MDI's tortious interference claim may be dismissed for this reason alone. *See Kesner*, 515 F. Supp. 3d at 190; *O'Brien v. Alexander*, 898 F. Supp. 162, 172 (S.D.N.Y. 1995), *aff'd*, 101 F.3d 1479 (2d Cir. 1996).

In any event, MDI fails to plausibly allege its purported claim. Tortious interference with a business relationship can take the form of "tortious interference with contract," which requires the plaintiff to allege the existence of a contract between the plaintiff and a third party and a "breach of that contract" induced by the defendant. *NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*, 87 N.Y.2d 614, 621, 664 N.E.2d 492, 495–96 (1996). A plaintiff can also allege that a "third party would have entered into or extended" a contract with the plaintiff "but for the intentional and wrongful acts of the defendant." *WFB Telecommunications, Inc. v. NYNEX Corp.*, 188 A.D.2d 257, 257, 590 N.Y.S.2d 460, 461 (1st Dep't 1992).

Here, however, MDI alleges only that it previously "had a business relationship with each entity" Aquila contacted and that "each has ceased all business with MDI." AC ¶¶ 90, 92. MDI attaches to the Amended Complaint a chart it prepared that purports to reflect past income ("since January 1, 2020") from those "[r]elations" [ECF No. 74-8]. The Amended Complaint does not allege, and the Court cannot reasonably infer, that MDI had "existing, enforceable contract[s]" with the lessees of the Equipment, *NBT Bancorp Inc.*, 87 N.Y.2d at 621, or that the lessees were

poised to enter into new contracts with MDI, *WFB Telecommunications, Inc.*, 590 N.Y.S.2d at 461, until Aquila communicated with the lessees about MDI's termination.

Thus, drawing all reasonable inferences in MDI's favor, the Court construes the Amended Complaint to assert a claim for tortious interference with prospective economic advantage. *See Littlejohn*, 795 F.3d at 306. "To state a cause of action for tortious interference with prospective business advantage, it must be alleged that the conduct by defendant that allegedly interfered with plaintiff's prospects either was undertaken for the sole purpose of harming plaintiff, or that such conduct was wrongful or improper independent of the interference allegedly caused thereby." *Jacobs v. Continuum Health Partners, Inc.*, 7 A.D.3d 312, 313, 776 N.Y.S.2d 279 (1st Dep't 2004); *see Kirch v. Liberty Media Corp.*, 449 F.3d 388, 400 (2d Cir. 2006) ("Under New York law, to state a claim for tortious interference with prospective economic advantage, the plaintiff must allege that (1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship) (internal quotation marks and citation omitted).

MDI asserts that Aquila acted "for the purpose of harming MDI's relationship[s]" with the recipients of the Letters. AC ¶ 91. However, MDI does not and cannot plausibly allege that Aquila sent the Letters to its lessees "for the *sole* purpose of harming" MDI. *Jacobs*, 776 N.Y.S.2d at 280 (emphasis added). Any such contention is "contradicted by . . . documentary evidence" deemed part of the Amended Complaint. *L-7 Designs, Inc.*, 647 F.3d at 422. As noted above, the Letters serve to inform lessees to "communicate with" Aquila, instead of MDI, about "servicing related matters" going forward [ECF No. 28-13]. *See Blue Tree Hotels Inv. (Canada), Ltd.*, 369 F.3d at 222. Furthermore, MDI cannot plausibly allege that it was "improper" for Aquila to inform lessees

of MDI's termination, *Jacobs*, 776 N.Y.S.2d at 279, since the Services Agreement provides that the parties will take steps to assure an "orderly transition" away from the use of MDI's services in the event of such termination, Services Agreement § 2(b)(iii).  Accordingly, MDI fails to state any claim for tortious interference.

**B.   MDI Fails To State a Claim for Breach of the Services Agreement Based on Post-Termination Monetization Fees and Profit Participation Fees.**

The Amended Complaint alleges, in broad strokes, that more than "$3.4 million in accrued fees are due and owing to MDI pursuant to the Services Agreement."  AC ¶ 34.  The Amended Complaint is opaque about precisely which of the various fees listed in the Services Agreement Aquila allegedly owes.[5]  However, the Amended Complaint asserts that MDI's "rights" to every type of fee listed in the Services Agreement "accrued upon" Aquila's "acquisition of the Equipment, yet deferred though the life and eventual sale or other monetization of the Equipment." AC ¶ 33; *see* AC ¶¶ 10, 31–34.   In its brief, MDI clarifies that it claims Aquila owes MDI Monetization Fees and Profit Participation Percentages based on Aquila's sales of, and proceeds from, the Equipment after Aquila terminated its relationship with MDI.  *See* Pl. Opp. at 22.   The plain language of Services Agreement, however, limits Monetization Fees and Profit Participation Percentages to sales and proceeds "during the term" of the Services Agreement.   Services Agreement §§ 3(a), 3(c).

Under New York law, a plaintiff asserting a breach of contract claim must allege (1) the existence of a contract, (2) performance by the party seeking recovery, (3) breach by the other party, and (4) damages suffered as a result of the breach.  *See Johnson v. Nextel Commc'ns, Inc.*,

---

[5] MDI's failure to identify in the Amended Complaint the specific fee provisions that Aquila allegedly breached is a problem in itself.  *See 34-06 73, LLC*, 39 N.Y.3d at 52 ("In order to state a cause of action to recover damages for a breach of contract, the plaintiff's allegations must identify the provisions of the contract that were breached") (internal quotation marks and citation omitted).

660 F.3d 131, 142 (2d Cir. 2011); *34-06 73, LLC v. Seneca Ins. Co.*, 39 N.Y.3d 44, 52, 198 N.E.3d 1282, 1287 (2022).  Here, the initial question is whether MDI plausibly alleges a breach by Aquila.  As noted above, both sides agree that the Services Agreement is unambiguous, and, the Court therefore relies on its plain language, read as a whole.  *See L. Debenture Tr. Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010).

Section 3(c) of the Services Agreement provides for a "Monetization Fee."  It states: "Upon sale by [Aquila] *during the term of this Agreement* of any Airframe or Engine, [Aquila] shall pay [MDI] a fee . . . ."  Services Agreement § 3(c) (emphasis added).  There is no merit to MDI's contention that its right to collect Monetization Fees "accrued upon Aquila's acquisition of the Equipment," without regard for when Aquila sold the Equipment.  Pl. Opp. at 22.  On the contrary, the Services Agreement plainly states that MDI was entitled to Monetization Fees for Aquila's "sales . . . during the term of th[e] Agreement."  Services Agreement § 3(c).

Under Section 3(a), the Services Agreement defines and discusses a "Profit Participation Percentage."  Services Agreement § 3(a).  It requires Aquila to pay MDI "one percent" of all proceeds from the Equipment "on a monthly basis."  Services Agreement § 3(a).  The Services Agreement specifically provides that the Profit Participation Percentage is paid on the "Profit Participation Payment Date," which is defined as "the 20th calendar day of each month *during the term of this Agreement*."  Services Agreement § 3(a) (emphasis added).  In other words, Aquila was not required to continue paying MDI a "monthly" fee on "the 20th calendar day" of the month in perpetuity after the termination of the Services Agreement.

MDI does not allege a breach of these provisions.  MDI alleges that, on October 24, 2022, "Aquila, through counsel, stated that it would not make any further payments to MDI pursuant to

the Services Agreement." AC ¶ 31.[6]  That communication was ten days after the effective date of termination (and after the 20th day of the month).  Thus, based on the unambiguous language of the Services Agreement, Aquila was not required to make further payments.

MDI stresses that, even after it was terminated, Aquila still had to pay "obligations" that had "accrued prior to the effective date of termination."  Pl. Opp. at 22 (quoting Services Agreement § 2(c).  True.  But the Services Agreement defines when the obligation to pay each type of fee accrues.  It makes clear that, although the obligation to pay an Origination Fee accrues "upon delivery to [Aquila] of an item of Equipment," Services Agreement § 3(a), the obligation to pay a Monetization Fee accrues, not upon acquisition, but "[u]pon sale by [Aquila] *during the term*" of the Services Agreement, *id.* § 3(c) (emphasis added), and the obligation to pay the Profit Participation Percentage accrues on "the 20th calendar day of each month *during the term*" of the Services Agreement, *id.* § 3(a) (emphasis added).

MDI does not seek payment of obligations that accrued before it was terminated.  MDI does not MDI does not allege, for example, that Aquila sold Equipment in September of 2022 and refused to pay a Monetization Fee on that pre-termination sale.  Rather, MDI seeks Monetization Fees and Profit Participation Percentages for post-termination sales and proceeds based on an untenable interpretation of the Services Agreement.

MDI contends that "MDI's rights to Monetization Fees" and "Profit Participation Percentages . . . accrued upon [Aquila's] acquisition of the Equipment" and survived MDI's termination such that MDI remained entitled collect them "through the life and eventual sale or

---

[6] MDI attaches to the Amended Complaint the October 24, 2022 letter from Aquila's counsel [ECF No. 74-7].  It is a "response" to a letter from MDI asserting that Aquila "will be responsible for paying Origination Fees, Monetization Fees, Consultancy Fees, and Profit Participation Payments after the termination of the Services Agreement."  Aquila's response states that "fees due from Aquila to MDI prior to the termination have been paid."  It further states that MDI's "interpretation of the Services Agreement is incorrect," since Monetization Fees are based on sales during the term of the Services Agreement, and MDI is no longer entitled to monthly Consultancy Fees and Profit Participation payments after the termination of the relationship.

other monetization of the Equipment." AC ¶ 33.  MDI alleges that "the parties contemplated" this arrangement.  AC ¶ 10.  But the Services Agreement, which MDI agrees is unambiguous, *see* Pl. Opp. at 24, says otherwise.  In the absence of ambiguity in the contract terms, MDI's allegations about the parties' intentions are irrelevant.  *Greenfield v. Philles Recs., Inc.*, 98 N.Y.2d 562, 569, 780 N.E.2d 166, 170 (2002) ("The best evidence of what parties to a written agreement intend is what they say in their writing.") (internal quotation marks and citation omitted).  Under the plain and unambiguous terms of the Services Agreement, MDI is not entitled to collect post-termination monetization fees or monthly profit participation fees.  Accordingly, Aquila's motion to dismiss the breach of contract claims related to those fees is granted.

### C.  MDI Fails To State a Claim Based on the Gakona and Jetran Engines.

MDI contends that Aquila owes MDI money in connection with four engines identified in unsigned addenda to the Services Agreement, Addendum No. 2, Addendum No. 3, and Addendum No. 5 [ECF No. 74-2 at 5–7, 8–10, 14–16].  *See* AC ¶¶ 35–38, 52, 75–77, 80–84.  Specifically, MDI alleges that, after the parties executed the Services Agreement, MDI identified, and Aquila acquired, three Gakona Engines and one Jetran Engine.  AC ¶ 35.  MDI alleges that, "[i]n spite of the fact that the addenda related to the Gakona Engines and Jetran Engine are not signed," Aquila "accepted [MDI's] performance" of those addenda "by acquiring" the engines.  AC ¶¶ 36, 37.  MDI specifically alleges that Aquila "paid MDI Origination Fees" for the Jetran Engine, but failed to pay Origination Fees for the Gakona Engines.  AC ¶ 38.  MDI alleges that Aquila also failed to pay "other fees" not specified in the Amended Complaint for all four engines.  AC ¶ 38.

Based on these allegations, MDI asserts claims for breach of contract or, in the alternative, unjust enrichment and quantum meruit.  *See* Pl. Opp. at 19 – 20.  MDI represents that it asserts the quasi-contract claims "in the alternative" because "Aquila has maintained . . . that the unsigned

addenda are not part of the Services Agreement." Pl. Opp. at 19–20. Both parties agree that, if the Court concludes that the unsigned addenda are valid modifications of the Services Agreement "MDI's unjust enrichment and quantum meruit claims would fail" because they are duplicative of MDI's breach of contract claim. Pl. Opp. at 19; *accord* Def. Mem. at 16; *see Corsello v. Verizon New York, Inc.*, 18 N.Y.3d 777, 790–91, 967 N.E.2d 1177 (2012).

Treating the unsigned addenda as valid modifications of the Services Agreement, MDI fails to state a claim for breach of contract. The addenda concerning the Gakona Engines expressly provide that Aquila "will not pay [MDI] any Origination Fee" for the acquisition of those engines. Addendum No. 2 § 2(a); Addendum No. 3 § 2(a). As such, MDI fails to allege a breach based on Aquila's failure to pay Origination Fees for the Gakona Engines. *See 34-06 73, LLC*, 39 N.Y.3d at 52; AC ¶ 38. In addition, while the addendum concerning the Jetran Engine does require Aquila to pay Origination Fees, MDI specifically alleges that Aquila "paid MDI Origination Fees" for the Jetran Engine. AC ¶ 38. Thus, MDI fails to allege any breach of the addenda in connection with the Origination Fees. *See 34-06 73, LLC*, 39 N.Y.3d at 52.

The Amended Complaint does not clearly identify what other fee provisions of the addenda Aquila allegedly breached. Rather, MDI generally alleges that "Aquila has failed to pay MDI any other fees related to the Jetran Engine," aside from the Origination Fees it paid, "and has not paid MDI all of the fees related to the Gakona Engines." AC ¶ 38. To state a claim for breach of contract under New York law, "the plaintiff's allegations must identify the provisions of the contract that were breached." *34-06 73, LLC*, 39 N.Y.3d at 52 (internal quotation marks and citation omitted). Aquila suggests in its brief that, aside from the Origination Fees for the Gakona Engines, MDI seeks only post-termination Monetization Fees and Profit Participation payments for the engines identified in the addenda. Def. Mem. at 16 n.4. MDI does not disagree or provide any clarity on

this point in its brief.  *See* Pl. Opp. at 8 (repeating the allegation that Aquila has not paid "the fees" it allegedly owes), *see id.* at 18.

All three unsigned addenda provide that Aquila must pay MDI a Monetization Fee "[u]pon the sale by [Aquila] during the term of the Services Agreement" of engines in question.  Addendum No. 2 § 2(c); Addendum No. 3 § 2(c); Addendum No. 5 § 2(c).  All three addenda also provide that the monthly Profit Participation Percentage "set forth in . . . the Services Agreement" applies to the Gakona and Jetran Engines.  Addendum No. 2 §§ 2(a), 2(b); Addendum No. 3 §§ 2(a), 2(b); Addendum No. 5 §§ 2(a), 2(b).  Thus, MDI is not entitled to post-termination fees for the engines identified in the unsigned addenda for the same reasons it is not entitled to post-termination fees for the Equipment identified in the Services Agreement, set forth at length above.  Accordingly, MDI fails to state a claim for breach of contract in connection with any alleged unpaid fees for the Gakona and Jetran Engines.

As the Court mentioned above, both parties agree that any claim for unjust enrichment or quantum meruit would be wholly duplicative of this breach of contract claim.  *See* Pl. Opp. at 19; Def. Mem. at 16; *see also Corsello*, 18 N.Y.3d at 790–91.  The Court also notes that New York courts "analyze quantum meruit and unjust enrichment together as a single quasi contract claim," *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005), and such a claim requires the plaintiff to plausibly allege "an expectation of compensation," *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 69 (2d Cir. 2000).  As the Court has explained, the addenda expressly state that Aquila will not pay MDI Origination Fees for the Gakona Engines and limit any Monetization Fees and Profit Participation Percentages to sales and proceeds during the term of the Services Agreement.  MDI therefore cannot plausibly allege an expectation of compensation in the form of Origination Fees for the Gakona Engines and post-termination

Monetization Fees and Profit Participation Percentages.  As such, MDI cannot plausibly allege its quasi contract claims.  *See Revson*, 221 F.3d at 69.

### D.  Contractual Interference with Business Partners

MDI asserts a claim for breach of the Services Agreement based on "Aquila's solicitation of and interference with MDI's business partners."  AC ¶ 53.  The principal factual allegations in the Amended Complaint about Aquila interacting with MDI's alleged business partners are the allegations that Aquila communicated with lessees of the Equipment about MDI's termination via the Letters and follow-up telephone calls.  As such, the Court infers that MDI's claim is based in part on those allegations.  However, the Amended Complaint also alleges that "MDI discovered that Aquila was using MDI's confidential information, including financial information, the identity of key contacts, and the terms of prior business dealings, to solicit business directly from MDI's business partners, in breach of the Services Agreement."  AC ¶ 40.

The "Interference with Business" section of the Services Agreement provides that (1) *MDI* "shall not divert" any business away from Aquila; (2) "neither party shall use any *Confidential Information* to solicit or otherwise provide services to a customer or financial partner of the other party, that are in competition with the services provided by either party"; and (3) "neither party shall interfere" with the *employment relationships* of the other party.  Services Agreement § 6(b) (emphases added).  The contract also states that both parties "acknowledge[]" that "the other party would suffer substantial damage" that would be "extremely difficult or impracticable to ascertain" if "either party was to interfere with any relationships with its clients, financial partners or employees." Services Agreement § 6(b)(ii).

Based on its plain language, the Services Agreement imposes a general obligation *on MDI* "not [to] divert" any business away from Aquila.  The Services Agreement does not impose on

Aquila a general obligation not to divert business from MDI using non-confidential information. Unlike the obligation on MDI, the *acknowledgment* in the Services Agreement that it would be difficult to calculate damages if "either party was to interfere with any relationships" is not phrased as a directive.  Services Agreement § 6(b)(ii); *see* Antonin Scalia & Bryan A. Garner, Reading Law 170 (2012) ("materially different" language should be read to have a different meaning).  As such, MDI's allegations about the Letters and follow-up calls about its termination do not support a claim for breach of the Interference with Business provision.

However, MDI also alleges that Aquila separately used "MDI's *confidential information*" to "solicit business directly from MDI's business partners."  AC ¶ 40 (emphasis added).  The Services Agreement plainly prohibits this alleged misuse of MDI's confidential information.  *See* Services Agreement § 6(b).  And the Court is required to accept the allegation as true.  *See Littlejohn*, 795 F.3d at 306.  Aquila addresses this issue for the first time in its reply brief, arguing that "the Amended Complaint fails to identify any trade secret Aquila allegedly misappropriated." Reply at 10.  As an initial matter, Aquila waived its argument for dismissal by failing to raise the argument in its opening brief.  *See Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998).  In addition, MDI is not pleading a trade secrets claim.  MDI adequately alleges that Aquila used confidential "financial information," the confidential "terms" of MDI's "prior business dealings," and other confidential information "to solicit business directly from MDI's business partners, in breach of the Services Agreement." AC ¶ 40.  As such, the Court denies Aquila's motion to dismiss with respect to MDI's claim for breach of the Interference with Business provision of the Services Agreement based on Aquila's alleged use of confidential information.

### E. **MDI States a Claim for Breach of the Audit Provision.**

Aquila is not entitled to dismissal at the pleading stage of MDI's claim for breach of the

audit provision.  MDI has a contractual right to audit Aquila's books and records, using a mutually agreed upon auditor, as the Amended Complaint clearly alleges, as the Services Agreement clearly states, and as Aquila itself acknowledges.  *See* AC ¶ 19; Services Agreement § 3(a); Def. Mem. at 18.  The audit still has not happened, and the parties remain locked in a dispute about who is to blame for that state of affairs [ECF Nos. 86, 87, 88, 89, 90, 94, 95, 96, 97, 98].  Questions of fact about the parties' performance "preclude[] dismissal."  *Adelhardt Constr. Corp. v. Citicorp N. Am., Inc.*, 181 A.D.3d 442, 443, 121 N.Y.S.3d 17, 19 (1st Dep't 2020).

Aquila contends that MDI fails to allege a breach of the audit provision because, as the Amended Complaint makes clear, MDI unilaterally engaged Weaver.  *See* Def. Mem. at 19; AC ¶ 21; *see* Audit Letter [ECF No. 74-4].  Aquila stresses that "[t]his Court has already highlighted this problem with MDI's audit rights claim," ruling that "MDI did not show 'a likelihood of success on the merits of its claim'" when "denying MDI's application for a preliminary injunction."  Def. Mem. at 19 (quoting Op. at 14).  On a motion to dismiss, however, the Court is not concerned with the ultimate merits of a claim.  *See Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir. 1995).  Moreover, the Amended Complaint alleges that, after Aquila rejected Weaver, MDI took steps "in good faith" to engage a mutually agreeable auditor, while Aquila "made no efforts" to do the same.  AC ¶ 28.  On a motion to dismiss, the Court is required to accept MDI's allegations as true and draw all inferences in MDI's favor. *See Littlejohn*, 795 F.3d at 306.  Accordingly, MDI states a claim for breach of the audit provision of the Services Agreement.

## F.  **MDI's Declaratory Judgment Claim Is Dismissed.**

MDI seeks a declaratory judgment.  AC ¶¶ 58–73.  This section of the Amended Complaint is difficult to follow but appears to recite some of MDI's arguments in support of its claims for breach of contract.  As an initial matter, "[d]eclaratory judgments . . . are remedies, not causes of

action." *Chiste v. Hotels.com L.P.*, 756 F. Supp. 2d 382, 406 (S.D.N.Y. 2010).  Moreover, the claim

is dismissed because it is duplicative and serves no useful purpose of its own.  *See Camofi Master*

*LDC v. Coll. P'ship, Inc.*, 452 F. Supp. 2d 462, 480 (S.D.N.Y. 2006).

## IV.    CONCLUSION

For the reasons set forth above, the motion to dismiss [ECF No. 75] is GRANTED in part

and DENIED in part.  Specifically, the motion to dismiss is granted with respect to MDI's claims

for: (1) breach of the fee provisions of the Services Agreement and breach of the Interference with

Business provision using non-confidential information; (2) declaratory judgment; (3) unjust

enrichment; (4) quantum meruit; (5) tortious interference with business relations; (6) trade

disparagement; and (7) defamation.  The motion to dismiss is denied with respect to MDI's claims

for breach of the Interference with Business provision using confidential information and breach

of the audit provision of the Services Agreement.

The Clerk of Court respectfully is requested to terminate the motion pending at docket

entry 75.

**SO ORDERED.**

**Date:  March 27, 2024**                                         **MARY KAY VYSKOCIL**
**        New York, NY**                                          **United States District Judge**