UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:    3/17/2026

MONOCOQUE DIVERSIFIED INTERESTS, LLC,

                           Plaintiff,

          -against-

AQUILA AIR CAPITAL (IRELAND) DAC,

                           Defendant.

22-cv-10015 (MKV)

OPINION & ORDER
GRANTING MOTION FOR
SUMMARY JUDGMENT

MARY KAY VYSKOCIL, United States District Judge:

Plaintiff Monocoque Diversified Interests, LLC ("MDI") initiated this lawsuit against Defendant Aquila Air Capital (Ireland) DAC ("Aquila") more than three years ago, following Aquila's decision to terminate is business relationship with MDI. Aquila, a company that acquires and sells aircraft, aircraft engines, and other aviation equipment, engaged MDI as a consultant in August 2021 pursuant to a "Services Agreement." Under the Services Agreement, MDI earned a monthly consulting fee and other fees which were contingent on Aquila's acquisition, sale, and proceeds from the aircraft assets specified in the parties' contract (the "Equipment"). About one year after executing the Services Agreement, Aquila provided MDI with a Notice of Termination, which became effective on October 14, 2022.

Shortly thereafter, MDI initiated this lawsuit, accusing Aquila of interfering with MDI's business relationships, breaching MDI's contractual right to audit Aquila's books and records, and failing to pay fees allegedly owed under the Services Agreement. The parties engaged in several rounds of acrimonious non-dispositive motion practice, and Aquila moved to dismiss this case in its entirety. The Court granted Aquila's motion as to all except two of MDI's claims [ECF No. 107 ("MTD Op.")]. Pertinent here, the Court "granted" the motion to dismiss "with respect to

1

MDI's claims for . . . breach of the fee provisions of the Services Agreement." MTD Op. at 26. The Court denied the motion to dismiss only "with respect to MDI's claims for breach of the Interference with Business provision using confidential information and breach of the audit provision of the Services Agreement." *Id.*

Before the Court is Aquila's motion for summary judgment on MDI's two remaining claims [ECF Nos. 124–27, 128 ("Mem.")]. Aquila clearly meets its burden to demonstrate that there are no material disputes of fact and Aquila is entitled to judgment as a matter of law on MDI's only remaining claims. In opposing summary judgment, MDI devotes much of its opposition to alleged unpaid invoices, notwithstanding the Court's earlier dismissal of its claims for breach of the fee provisions [ECF No. 131 ("Opp.")]. MDI also attempts to invoke purported evidence that was not timely disclosed, arguing that its own failure to comply with court-ordered discovery deadlines "is of no moment." Opp. at 15 n.4, 16 n.5. As such, and for all of the reasons set forth below, Aquila's motion for summary judgment is GRANTED.

## I.    FACTUAL BACKGROUND[1]

### A. <u>The Parties</u>

Monocoque Diversified Interests, LLC ("MDI") is "a boutique company, which serves as a consultant with expertise in advising companies in the acquisition, leasing, exchange, and disposition of aircraft, aircraft engines, and other aircraft assets." Def. 56.1 ¶ 7; Pl. Counter 56.1

---

[1] The facts are taken from the evidence cited in the parties' Local Civil Rule 56.1 Statements, including the affidavits and declarations submitted in connection with the motion for summary judgment and the exhibits attached thereto [ECF Nos. 125 ("Wood Aff."), 126 ("Def. 56.1"), 127 ("Simes Decl."), 127-3 (the "Services Agreement"); 127-4 at 9 ("Invoice No. 322"), 127-4 at 20 ("Invoice No. 332"), 127-4 at 19 ("Invoice No. 335"), 127-4 at 16 ("Invoice No. 336"), 131-1 ("Pl. Counter 56.1"), 131-2 ("Pl. 56.1"), 131-4 ("Keyes Decl."), 131-5 at 8 ("Invoice No. 378"), 131-5 at 16 ("Invoice No. 377"), 131-5 at 23 ("Invoice No. 343"), 131-5 at 24 ("Invoice No. 369"), 131-5 at 25 ("Invoice No. 344"), 131-5 at 26 ("Invoice No. 304"), 131-5 at 27 ("Invoice No. 307"), 131-5 at 28 ("Invoice No. 290"), 131-5 at 29 ("Invoice No. 303"), 131-5 at 30–31 ("Invoice No. 269"), 131-5 at 33 ("Invoice No. 386"), 131-12 ("CBIZ Status of Engagement Letter"), 132 ("Def. Counter 56.1")]. The facts described in this Opinion are undisputed unless otherwise indicated.

¶ 7.   Aquila Air Capital (Ireland) DAC ("Aquila"), which was founded by aviation "industry veteran" Lewis A. Wood, is a "specialty finance platform . . . focused on purchasing and leasing commercial aircraft, engines, and other aviation equipment."  Def. 56.1 ¶¶ 1, 2 (quoting Simes Decl., Ex. 1); Pl. Counter 56.1 ¶¶ 1, 2.  MDI admits that "[d]uring his many years in the industry, Mr. Wood and members of the Aquila team have worked with virtually every major player in the aviation industry."  Pl. Counter 56.1 ¶ 4; Def. 56.1 ¶ 4.

B.  **The Services Agreement**

There is no dispute that MDI and Aquila executed a "Services Agreement" on August 25, 2021.  Def. 56.1 ¶ 8; Pl. Counter 56.1 ¶ 8; Simes Decl., Ex. 3 (the "Services Agreement").  The parties agree that, under the Services Agreement, MDI agreed to provide "consulting services" to Aquila in connection with the acquisition, sale, and management of certain aircraft assets (the "Equipment").  Def. 56.1 ¶ 9; Pl. Counter 56.1 ¶ 9; *see* Services Agreement at 1.  In return, MDI agreed to pay "monthly consulting fees" and various other fees, detailed below.  Def. 56.1 ¶ 10; Pl. Counter 56.1 ¶ 10; *see* Services Agreement § 3.

1.  **The Fee Provisions**

The parties agree that the Services Agreement provides for a "Consultancy Fee," which was to be paid each month until the effective date of termination.  Services Agreement § 3(b); *see id.* § 2(c); Def. 56.1 ¶ 10; Pl. Counter 56.1 ¶ 10.[2]  The parties also agree that the Services

---

[2] MDI has never previously alleged that Aquila failed to pay the monthly Consultancy Fee owed under Section 3(b) during the term of the Services Agreement [see ECF No. 74 (the "Amended Complaint" or "AC") ¶¶ 31–33, 52; ECF No. 74-7 ("October 2022 Letter"); ECF No. 101 ("MTD Op.") at 17–20 & n.6].  Indeed, MDI attached to the Amended Complaint a letter, dated October 24, 2022, in which Aquila represented that it had paid all Consultancy Fees for the duration of the Services Agreement, except October 2022, which Aquila would pay on a pro rata basis, since the termination of the Services Agreement became effective on October 14, 2022.  *See* October 2022 Letter at 1; *see also* MTD Op. at 19 n.6.  Aquila also stated that MDI was not entitled to collect any monthly Consultancy Fees after the effective date of termination.  *See* October 2022 Letter at 1; *see also* MTD Op. at 19 n.6.  MDI has never previously disputed these representations, which MDI incorporated into its pleading.  *See* MTD Op. at 9.  Rather, in the Amended Complaint, MDI alleged only, in broad strokes, that it would be entitled to "*any* Consultancy Fees" that might be "due under Section 2(c)," which refers only to any unpaid Consultancy Fees for the period between the notice of termination

3

Agreement provides for an "Origination Fee," which Aquila was required to pay MDI for "having identified and negotiated the opportunity for the acquisition[] of" each item of the Equipment. Services Agreement § 3(a); *see* Def. 56.1 ¶¶ 10, 14, 15; Pl. Counter 56.1 ¶¶ 10, 14, 15.[3]  There is no dispute that the Services Agreement also provides for a "Monetization Fee," tied to a "sale by [Aquila] during the term of" the Services Agreement.  Services Agreement § 3(c); *see* Def. 56.1 ¶¶ 10, 17; Pl. Counter 56.1 ¶¶ 10, 17.[4]  There is further no dispute that the Services Agreement also provides for a potential "Profit Participation Percentage," tied to "proceeds" from the Equipment "during the term of th[e] Agreement."  Services Agreement § 3(a).[5]

In opposing summary judgment, MDI invokes for the very first time another fee provision of the Services Agreement.  MDI now contends that Aquila owes unpaid invoices for a catchall category of "other consulting services," which purportedly exists in Section 3(e) of the Services Agreement.  The relevant provision, entitled "Conversion, C-Check or other Consulting Services Fee," states in pertinent part:

> *To the extent [Aquila] elects to subject a Batch 1 Airframe or a Batch 2 Airframe*

---

and effective date of termination.  AC ¶ 33 (emphasis added); *see* Services Agreement § 2(c).  However, MDI has never previously suggested that Aquila did not, in fact, pay all monthly Consultancy Fees, including, after Aquila's October 2022 Letter, the pro rata fees for October 2022.  Thus, the Court explained in its Opinion and Order Granting in Part and Denying in Part the Motion To Dismiss that, while the "Amended Complaint [was] opaque about precisely which of the various fees listed in the Services Agreement Aquila allegedly owes, . . . [i]n its brief, MDI clarifie[d] that it claims Aquila owes [only] MDI Monetization Fees and Profit Participation Percentages," not Consultancy Fees.  MTD Op. at 17 & n.5.  Based on the parties' arguments at the time, the Court entirely dismissed MDI's claims for breach of the fee provisions of the Services Agreement.

[3] There is no dispute that "Aquila paid MDI all Origination Fees owed under Section 3(a) of the [Services] Agreement."  Def. 56.1 ¶ 14; Pl. Counter 56.1 ¶ 14; Wood Aff. ¶ 25.  Indeed, the parties agree, "Aquila paid MDI more than $3,800,000 in Origination Fees."  Def. 56.1 ¶ 15; Pl. Counter 56.1 ¶ 15; Wood Aff. ¶ 26.

[4] There is also no dispute that "Aquila paid MDI all Monetization Fees on each of the items of Equipment that were sold during the term of the Agreement."  Def. 56.1 ¶ 17; Pl. Counter 56.1 ¶ 17; Wood Aff. ¶ 28.

[5] Aquila submits that "[n]o item of Equipment generated a profit during the term of the Agreement," and, as such, MDI did not earn a Profit Participation Percentage.  Def. 56.1 ¶ 46; Simes Decl., Ex. 12.  MDI contends that it must complete its audit "to determine whether money is owed for the "Profit Participation Percentage."  Opp. at 14.  However, as explained below, the Court has already ruled that MDI failed to state a claim for breach of the "Profit Participation Percentage" provision of the Services Agreement and, as such, granted Aquila's motion to dismiss such claim.  MTD Op. at 17–19.

*to a freighter conversion* for additional service capabilities *and requests that [MDI] provide oversight and management of such freighter conversion process*, [MDI] will be compensated according to [MDI's] customary rates (the "Conversion Fee"). The Consultant's customary rates relating to a freighter conversion, C-Check or other consulting services, including non-scope services, per day are as follows:

| | |
|---|---|
| Operations Personnel | $1,500 |
| Labor (Technical) USA | $1,000 |
| Sales Support | $750 |
| Sales | $750 |
| Accountant/Prof Services | $750 |

[Aquila] and [MDI agree that an estimate for the total *Conversion Fee* shall be agreed between the parties prior to Company contracting for a conversion slot.

[MDI] will bill for an eight hour day at these rates. Any partial days or additional hours in excess of eight (8) per day will be billed at an hourly rate calculated by dividing the daily rate by eight (8). [MDI] will bill these fees monthly and payment of the invoice will conform to the standard terms specified in this Section 3(g). [Aquila] will also reimburse [MDI] for reasonable transportation, lodging and meal expenses for its personnel associated with [MDI's] *conversion support* upon issuance of an invoice itemizing such expenses together with receipts, invoices or other reasonable documentation in support thereof.

Services Agreement § 3(e) (emphases added).

### 2. The Audit Provision

There is no dispute that, in the section on fees and expenses, the Services Agreement provides: "[MDI] shall have the right no more than once per calendar year to engage a mutually agreed third party auditing firm to audit [Aquila's] books and records in respect of the Equipment at [MDI's] sole cost and expense." Services Agreement § 3(a).

### 3. Confidential Information and Interference with Business Opportunities

There is no dispute that the Services Agreement contains a section entitled "Interference with Business; Opportunities." Services Agreement § 6(b).[6] Section 6(b) provides, in pertinent

---

[6] In full, Section 6(b) provides:

During the term of this Agreement and for a period of two (2) years after termination of this Agreement, (i) the Consultant agrees that the Consultant shall not divert or attempt to divert from

part, that during the "Consultancy Period" and for a period of one year thereafter, "neither party shall use Confidential Information to solicit or otherwise provide services to a customer or financial partner of the other party, that are in competition with the services provided by either party." *Id.* § 6(b)(x).

In Sections 4 and 5, the Services Agreement defines "Confidential Information" to "mean" (1) the "work product generated by [MDI] solely or jointly with others, specifically in the performance of the Services" (the "Work Product"), and (2) information either related to the Equipment, or leasing opportunities for the Equipment, or "provided by" Aquila or its affiliates "to [MDI]." Services Agreement §§ 5(a), 4(a). The section on Confidential Information specifically provides that ***MDI*** "will not . . . use the Confidential Information for any purpose whatsoever other than the performance of the Services." *Id.* § 5(b).

The section that defines Work Product also expressly provides: "In the event that [MDI] integrates any work that was previously created by [MDI] into any Work Product, [MDI] shall grant to, and [Aquila] is hereby granted, a worldwide, royalty-free, perpetual, irrevocable license to exploit the incorporated item." *Id.* § 4(b).

---

the Company any business of any kind related to the Equipment, including but not limited to the solicitation of or interference with any of its suppliers, engine vendors, lessees or customers related to the Equipment, and (ii) each party agrees and acknowledges that the other party would suffer substantial damage if either party was to interfere with any relationships with its clients, financial partners or employees, and that it would be extremely difficult or impracticable to ascertain the actual amount of damages to either party if a Customer were to divert either party's business opportunities or to employ one of the other party's employees in violation hereof. Therefore, Company and Consultant agree that as of the Effective Date, and continuing during the Consultancy Period and for one (1) year thereafter: (x) neither party shall use any Confidential Information to solicit or otherwise provide services to a customer or financial partner of the other party, that are in competition with the services provided by either party; and (y) neither party shall interfere with any employment relationships or hire, solicit or attempt to induce any of the other party's employees to leave their employment.

Services Agreement § 6(b).

### 4. Termination

The Services Agreement provides that Aquila may terminate the consultancy without cause by giving MDI sixty days "prior written notice." Services Agreement § 2(b)(iii). The parties agree that the Services Agreement remains in force during those sixty days. *See* Def. 56.1 ¶¶ 47–49; Pl. Counter 56.1 ¶¶ 47–49.

## C. **The Termination**

There is no dispute that, "in accordance with" the Services Agreement, Aquila sent MDI a Notice of Termination on August 15, 2022. Def. 56.1 ¶ 47; Pl. Counter 56.1 ¶ 47; *see* Simes Decl., Ex. 13. The parties agree that the termination became effective on October 14, 2022. Def. 56.1 ¶¶ 48, 49; Pl. Counter 56.1 ¶¶ 48, 49.

## D. **The Fees Aquila Allegedly Owes MDI**

In opposing Aquila's motion for summary judgment, MDI contends that Aquila has refused to pay fifteen invoices:

> (a) [#]269 for "Consulting & Expenses for Delta" dated July 8, 2022 (Invoices spreadsheet—Keys dec.— Exh. A)
>
> (b) #290 for "Oak Island Consulting & Expenses" dated August 3, 2022 (Id.)
>
> (c) #303 for "Oak Island Consulting & Expenses" dated August 17, 2022 for $15,716.42 (Id.)
>
> (d) #304 for "Consulting for DHL" dated August 18, 2022 for $281.25 (Id.)
>
> (e) #307 for "Inspection Advisory" dated August 31, 2022 for $375.00 (Id.)
>
> (f) #322 for "JT Steinglein Consulting" dated September 26, 2022 for $117.20 (Id.)
>
> (g) #332 for "JT Steinglein Consulting" dated October 13, 2022 for $937.52 (Id.)
>
> (h) #335 for "Mark William Consulting" dated October 13, 2022 for $445.32 (Id.)
>
> (i) #336 for "5% Markup on WNG Parts" dated October 13, 2022 for $12,338.25 (Id.)
>
> (j) #344 for "Leo Nadeau Consulting" dated October 19, 2022 for $750.00 (Id.)
>
> (k) #343 for "Leo Nadeu Consulting" dated November 17, 2022 for $3,000 (Id.)

(l) #369 for "Monthly Consultancy Fee" dated November 18, 2022 for $5,000 (Id.)

(m) #377 for "Parts Markup dated December 23, 2022 for $384.20 (Id.)

(n) #378 for "5% Markup on AAR" dated December 23, 2022 for $3,960.00 (Id.)

(o) #386 for "Leo Nadeau Consulting" dated January 23, 2023 for $6,000 (Id.)

Pl. 56.1 ¶ 1(a)–(o) (footnotes omitted); *see* Keyes Decl. ¶¶ 3–5, 16; ECF Nos. 131-5 at 30–31 ("Invoice No. 269"), 131-5 at 28 ("Invoice No. 290"), 131-5 at 29 ("Invoice No. 303"), 131-5 at 26 ("Invoice No. 304"), 131-5 at 27 ("Invoice No. 307"), 127-4 at 9 ("Invoice No. 322"), 127-4 at 20 ("Invoice No. 332"), 127-4 at 19 ("Invoice No. 335"), 127-4 at 16 ("Invoice No. 336"), 131-5 at 25 ("Invoice No. 344"), 131-5 at 23 ("Invoice No. 343"), 131-5 at 24 ("Invoice No. 369"), 131-5 at 16 ("Invoice No. 377"), 131-5 at 8 ("Invoice No. 378"), 131-5 at 33 ("Invoice No. 386").[7] Notably, six other invoices are dated after the October 14, 2022 date of termination of the Services Agreement. *See* Pl. 56.1 ¶ 1(j)–(o); Keyes Decl. ¶ 16.

In MDI's 56.1 statement, its counsel asserts: "*All* services in the invoices referenced above were performed prior to the termination date of the Agreement of October 14, 2022. (Keyes Dec. ¶ ___.)." Pl. 56.1 ¶ 2 (emphasis added) (absence of citation in original). As reflected in the quoted language, MDI's counsel purports to rely on the Declaration of Mary Alice Keyes but does not actually cite any specific testimony. By contrast, in the Declaration on which counsel purports to rely, Keyes attests that, in actuality, the invoices were *either* for services prior to the termination date, "*or* were for the completion of work shortly *after the termination* date for the benefit of Aquila." Keyes Decl. ¶ 17 (emphases added). Keyes does not specify which invoices fall into which category.

---

[7] Although MDI's 56.1 statement asserts that all "[l]isted invoices are attached" to the Declaration of Mary Alice Keyes, the principal of MDI, upon the Court's review, Invoices 322, 332, 335, and 336 are not included among MDI's exhibits. These invoices are included among Aquila's exhibits, however.

Keyes also attests that all of the "invoices are for 'Consultancy Fees' or 'other consulting services' under the 'Services Agreement.'" Keyes Decl. ¶ 17; *see* Pl. 56.1 ¶ 17. In its brief, MDI asserts that the "invoices are for 'Consultancy Fees' or, *more properly*, 'other consulting services.'" Opp. at 7 (emphasis added).

Aquila's CEO, Wood, attests that "Aquila paid MDI all monthly consultancy fees required under the Services Agreement." Wood Aff. ¶ 29. Aquila submits that it properly rejected invoices for purported other consulting services because, under the plain terms of the Services Agreement, Aquila agreed to pay additional consulting fees "only if Aquila elected to subject an airframe to a 'freighter conversion,'" which Aquila never did. *Id.* ¶¶ 30 (emphasis in original), 31.[8] Aquila also points out that several of the invoices themselves contradict MDI's assertion that they reflect any "other consulting services" under Section 3(e) of the Services Agreement. Reply at 5. Specifically, Section 3(e) provides for hourly billing at a flat rate, but Invoices 336 and 378 bill Aquila for a percentage of other items. *See* Invoice No. 336 ("5% markup on WNG parts purchase . . . $246,765 * 0.05"); Invoice No. 378 ("5% markup on AAR Supply Chain . . . $79,200 x .05)").

In its brief, MDI asserts that there is a separate dispute as to the "calculation of 'Profit Participation Percentage'" and "whether money is owed for the 'Profit Participation Percentage." Opp. at 1, 2, 14. Aquila submits that "[n]o item of Equipment generated a profit during the term of the Agreement," and, as such, MDI did not earn a Profit Participation Percentage. Def. 56.1 ¶ 46; Simes Decl., Ex. 12. MDI purports to offer evidence of a redline of an earlier draft of the parties' contract, which MDI asserts show that Aquila improperly deducted the cost of assets when calculating whether they generated proceeds for purposes of calculating the Profit Participation

---

[8] MDI does not dispute that "Aquila never elected to subject an airframe covered by the [Services] Agreement to a freighter conversion." Wood Aff. ¶ 31. Rather, MDI contends that Section 3(e) is a catchall provision that allowed MDI to bill Aquila for individual consulting services on top of the monthly Consultancy Fees that Aquila paid MDI for its consulting services.

9

Percentage. *See* Opp. at 3–5; Keyes Decl., Ex. B, Keyes Decl. ¶ 6. MDI also asserts that Aquila's alleged refusal to provide "backup" for its calculation of the Profit Participation Percentage has stymied MDI's audit. Keyes Decl. ¶ 7.

### E. The Audit Demand

There is no dispute that, "[o]n October 12, 2022, two days before the effective date of termination," MDI provided Aquila with notice that MDI was exercising its right to audit Aquila's books and records. Def. 56.1 ¶ 50; Pl. Counter 56.1 ¶ 50. Indeed, there is no dispute that MDI had already, unilaterally, selected an accounting firm, Weaver. *See* Def. 56.1 ¶ 52; Pl. Counter 56.1 ¶ 52. As both parties agree, Aquila responded that it would "of course comply with the request for an audit under the terms of the Services Agreement" but "rejected MDI's unilateral selection of Weaver and proposed contacting four other firms—KPMG, Ernst & Young, PwC, or Deloitte." Def. 56.1 ¶¶ 51, 52; Pl. Counter 56.1 ¶¶ 51, 52.

There is no dispute that, thereafter, "Aquila reached out again to propose another specific auditor from FTI." Def. 56.1 ¶ 55; Pl. Counter 56.1 ¶ 56. The parties agree that, months later "Aquila and MDI agreed . . . that FTI would serve as the auditor" and agreed to the "scope" of the audit. Def. 56.1 ¶ 60; Pl. Counter 56.1 ¶ 60. Aquila submits evidence that "[d]espite FTI's efforts to consummate an engagement, MDI never permitted FTI to commence its audit of Aquila's books and records." Def. 56.1 ¶ 61 (citing ECF Nos. 89, 112). MDI responds that "this delay was caused by MDI's predecessor counsel, not MDI." Pl. Counter 56.1 ¶ 61.

The parties agree that, approximately one year later, "Aquila and MDI mutually agreed" to use another firm, which was then called Marcum and is now CBIZ (the "Auditor"), to conduct the audit of Aquila's books and records. Def. 56.1 ¶ 63; Pl. Counter 56.1 ¶ 63; *see* Wood Aff. ¶ 42. Thereafter, the parties agree, the Auditor issued a request for documents and information in

connection with its audit.  Def. 56.1 ¶ 64; Pl. Counter 56.1 ¶ 64; Simes Decl., Ex. 15.  There is no

dispute that the parties mutually "agreed to narrow the scope of [the Auditor's] information

request."  Def. 56.1 ¶ 65; Pl. Counter 56.1 ¶ 65; Simes Decl., Ex. 15.  There is also no dispute that

"Aquila responded to [the Auditor's] information request, as modified" by the parties' agreement.

Def. 56.1 ¶ 66; Pl. Counter 56.1 ¶ 66; Simes Decl., Ex. 17.

As MDI's own evidence demonstrates, Aquila has submitted to the Auditor: its "profit and

loss statement" for the relevant period, its "balance sheet, "Aged accounts receivable" for the

Equipment, "liabilities relating to the Equipment," "expenses relating to the Equipment," "All

Equipment proceeds" for the relevant period, and "Net profit and/or cash flow from the sale, lease

or otherwise resulting from the Equipment . . . ."  [ECF No. 131-11 ("CBIZ Status of Engagement

Letter")].[9]  Nevertheless, more than three years after MDI commenced this lawsuit, the audit has

not been completed.

MDI contends that Aquila is to blame for the failure to complete the audit because, MDI

asserts, "Aquila has not provided documentation acceptable to a reasonable accountant to

substantiate that no money is due for a 'Profit Participation Payment.'"  Pl. 56.1 ¶ 8.  The sole

piece of evidence MDI submits in support of that contention is a letter a from the Auditor that was

prepared after Aquila filed its motion for summary judgment.  *See* CBIZ Status of Engagement

Letter.  The CBIZ Status of Engagement Letter reflects that it was prepared "[p]ursuant to [MDI's]

request."  *Id.*  It further states:

> As of the date of this letter we are unable to determine, within a reasonable degree
> of accounting certainty, the funds due MDI.  This conclusion is due to the level of,
> and full disclosure of, documents required by Aquila has not been provided [sic].

---

[9] As explained below, MDI solicited and submitted the CBIZ Status of Engagement Letter in purported opposition to
Aquila's motion for summary judgment.  That purported evidence, however, confirms that Aquila provided the auditor
with the records listed above.

CBIZ Status of Engagement Letter.

Aquila argues that it has complied with the audit provision of the Services Agreement and that the CBIZ Status of Engagement Letter, reflecting the Auditor's conclusion that Aquila has not provided sufficient documentation, "amounts to undisclosed expert testimony" that "should be disregarded on summary judgment." Mem. at 14 n.1; Def. Counter 56.1 ¶ 165.

## F.  **The Supposed Use of Confidential Information To Interfere with Business Opportunities.**

There is no dispute that, shortly before the close of discovery, MDI "identified" a company called Turbo Resources International Inc. ("Turbo Resources") as a customer of MDI [ECF No. 131-13 at 4–6 ("Customer List")]. Pl. 56.1 ¶ 5; *see* Def. Counter 56.1 ¶ 162. MDI characterizes this discovery as a "protected customer list" it disclosed in connection with the "'Interference with Business; Opportunities' provision" of the Services Agreement. Pl. 56.1 ¶ 5. Aquila disputes that the Customer List is a "protected customer list." Def. Counter 56.1 ¶ 162. Aquila also maintains that "there is no evidence in the record" that, in fact, Turbo Resources has ever been a customer or financial partner of MDI. Def. Counter 56.1 ¶ 162.

In the record before the Court are two documents related to Turbo Resources. *See* Keyes Decl., Ex. I. One document is a typed list, which is not dated or signed, entitled "MDI Customers List per conferral." Customer List. The purported Customer List is a single-spaced column of what appear to be names of companies, including "Turbo Resources."[10] Customer List at 2. The second document appears to be an email from Keyes forwarding (to an individual who has not been identified in this litigation) an email inquiry from the "Founder and CEO" of Turbo Resources to "assetmanagement@mdi.aero" [ECF No. 131-13 at 2–3 ("Turbo Emails")]. The email inquiry

---

[10] MDI's purported Customer List also includes household names like Airbus, American Airlines, Boeing, "Delta (all affiliates and subsidiaries)," FedEx, KLM, Lufthansa, Southwest, United Airlines, and many others.

says "Turbo Resources Intl would have interest in receiving information . . . Regarding the 757 airframes. Turbo Resources is a [sic] Arizona company involved in aircraft aftermarket . . . Parts sales. Turbo has been in business for 38 years in this space. . . . Kindly advise contact information . . . ." Turbo Emails at 1–2. In Keyes' email, she directs the recipient to note "his interest in this specific asset type." *Id.* at 1.

MDI submits that, after the termination date of the Services Agreement, Aquila sold to Turbo Resources several airframes, which had been listed among the Equipment in the Services Agreement and, MDI asserts, "were maintained by MDI during the term of the 'Services Agreement,' using MDI's expertise." Pl. 56.1 ¶¶ 3–7; Keyes Decl. ¶ 19. Aquila does not dispute that it sold such airframes to Turbo Resources. Def. Counter 56.1 ¶ 164. However, Aquila asserts that "MDI did not "maintain" these airframes." *Id.*

MDI contends that it has "identified several instances where Aquila was essentially parroting MDI's 'Work Product' for 'customers and financial partners' that the two shared." Opp. at 12 (citing Pl. Counter 56.1 ¶¶ 75, 78, 85, 154). In particular, MDI contends that MDI had a general terms agreement (hereinafter, "GTA") with Delta, and MDI's "technical language then magically found its way into Aquila's" subsequent GTA with Delta. *Id.* (citing Keyes Decl., Exs. D, E; Simes Decl., Ex. 22). Keyes attests that MDI put in substantial work on its GTA . . . with Delta, which "governed the lease of an engine from which Aquila earned a return." Keyes Decl. ¶ 10. She asserts that "Aquila then apparently took that GTA and used it, replacing MDI's name, in anticipation of termination of the 'Services Agreement' with MDI." *Id.*

MDI admits that Aquila solely owns "all records" related to the Equipment (*i.e.* all of the aircraft assets with the Services Agreement was concerned). Def. 56.1 ¶ 69 ("Upon Aquila's acquisition of every piece of Equipment covered by the Agreement, the specific piece of equipment

and all records related to that equipment were owned solely by Aquila."); Pl. Counter 56.1 ¶ 69 ("Admitted"); *see* Wood Aff. ¶ 48.

## II.    PROCEDURAL HISTORY

MDI initiated this lawsuit against Aquila, in late November 2022, by filing a Complaint [ECF No. 1], a motion for a preliminary injunction [ECF Nos. 4, 5], and a motion for expedited discovery and a hearing on its motion for a preliminary injunction [ECF Nos. 6, 7].  The Court granted in part and denied in part the request for expedited discovery [ECF No. 13].  In particular, the Court granted expedited discovery with respect to MDI's allegations that Aquila had tortiously interfered with MDI's business relationships and denied expedited discovery with respect to its contract claims [ECF No. 13].  After holding a hearing [ECF No. 39], the Court denied MDI's motion for a preliminary injunction in its entirety [ECF No. 58].

So began more than three years of litigation in which MDI has consistently failed to substantiate its vehement accusations of wrongdoing by Aquila. Shortly after denying MDI's motion for a preliminary injunction, the Court was compelled to issue a temporary restraining order directing MDI to restore Aquila's access to its own records [ECF No. 61].

MDI thereafter filed its operative pleading, the Amended Complaint [ECF No. 74 ("AC")]. MDI attached to the Amended Complaint, *inter alia*, the Services Agreement [ECF No. 74-1], several addenda [ECF No. 74-1], the Notice of Termination [ECF No. 74-3], its audit demand [ECF No. 74-4], and a letter dated October 24, 2022 from Aquila to MDI stating, among other things, that "all fees due from Aquila to MDI prior to the termination ha[d] been paid," except the Consultancy Fees for October 2022, which Aquila would remit once "pro-rated," and that MDI was not entitled to post-termination payments [ECF No. 74-7 (the "October 2022 Letter")].

14

In the Amended Complaint, MDI expressly identified seven claims for relief.  First, MDI purported to assert a single claim for breach of contract, although it alleged that Aquila had breached multiple different provisions of the Services Agreement by (i) refusing to make payments it owes MDI, (ii) interfering with MDI's audit right, and (iii) soliciting and interfering with MDI's business partners.  AC ¶¶ 51, 52, 53.  Second, MDI asserted a claim for declaratory judgment, although the relief sought was inscrutable.  AC ¶¶ 58–73.  Third, MDI asserted a claim for unjust enrichment on the ground that Aquila had benefited from the Equipment but had allegedly refused to pay MDI what it owed.  AC ¶¶ 74–78.  Fourth, MDI asserted a claim for quantum meruit on the same grounds.  AC ¶¶ 79–85.  For its fifth, sixth, and seventh claims, respectively, MDI asserted claims for tortious interference with business relations, trade disparagement, and defamation based on Aquila's alleged communications with other companies about the termination of its relationship with MDI.  *See* AC ¶¶ 86–103.

Aquila moved to dismiss the Amended Complaint "in its entirety," and MDI opposed that motion [ECF Nos. 75, 76 (the "Motion To Dismiss" or "Def. MTD"), 78, 79, 80].  Def. MTD at 25.  In an Opinion and Order Granting in Part and Denying in Part the Motion To Dismiss, the Court dismissed all but two of MDI's claims [ECF No. 101 ("MTD Op.")].

Pertinent here, the Court dismissed "MDI's claims for . . . breach of the fee provisions of the Services Agreement."  MTD Op. at 26.  In its Opinion, the Court observed that the "Amended Complaint is opaque about precisely which of the various fees listed in the Services Agreement Aquila allegedly owes," which was a "problem" because, "'[i]n order to state a cause of action to recover damages for a breach of contract, the plaintiff's allegations must identify the provisions of the contract that were breached.'"[11]  MTD Op. at 17 & n.5 (quoting *34-06 73, LLC v. Seneca Ins.*

---

[11] MDI expressly concedes that this "criticism was fair," noting that the Amended Complaint was filed by "predecessor counsel."  MDI Opp. at 8 & n.1.

*Co.*, 39 N.Y.3d 44, 52, 198 N.E.3d 1282, 1287 (2022)).  The Court explained that, "[i]n its brief, MDI clarifie[d] that it claims Aquila owes MDI Monetization Fees and Profit Participation Percentages" only.  *Id*.  Crucially, moreover, "both sides agree[d] that the Services Agreement is unambiguous."  *Id*. at 18; *see* ECF No. 78 at 24 (MDI stressing in its brief in opposition to the motion to dismiss that "[n]either Aquila nor MDI has asserted that the Services Agreement is ambiguous.")  As such, relying on the parties' representations about the nature of the dispute and the "plain language" of their contract, the Court ruled that MDI failed to state a claim for breach of contract based on alleged unpaid fees.  *Id*. at 18–20.

Similarly pertinent, the Court dismissed any claim for "breach of the Interference with Business provision using non-confidential information."  *Id*.  The Court also dismissed MDI's claims for declaratory judgment, unjust enrichment, quantum meruit, tortious interference with business relations, trade disparagement, and defamation.  *Id*.  The Court denied Aquila's Motion To Dismiss the Amended Complaint "in its entirety," Def. MTD at 25, only "with respect to MDI's claims for breach of the Interference with Business provision using confidential information and breach of the audit provision of the Services Agreement," MTD Op. at 26.

After the parties had briefed Aquila's Motion To Dismiss, but before the Court had ruled, the parties filed cross-motions for sanctions [ECF Nos. 86, 87, 88, 89, 90, 94, 95, 96, 97, 98]. Specifically, in October 2023, Aquila filed a motion for both monetary and non-monetary sanctions on both MDI and its counsel at that time.  Aquila argued that while it had made diligent efforts to commence the audit, MDI and its counsel had engaged in a pattern of unreasonable delays.  Aquila sought reimbursement and a declaration that MDI had forfeited its audit right.  MDI filed a cross-motion for sanctions arguing only that Aquila should not have moved for sanctions against MDI. MDI's counsel thereafter moved to withdraw [ECF No. 102].

16

The Court denied the parties' cross-motions for sanctions and granted counsel's motion to withdraw [ECF No. 107].  Current counsel for MDI appeared [ECF No. 109], and, thereafter, the parties filed a letter representing that they had "resolve[d]" their dispute over the audit [ECF No. 112].  In response, the Court directed the parties to file a stipulation of voluntary dismissal as to that claim [ECF No. 113], but no such stipulation was filed.

The Court issued a Case Management Plan and Scheduling Order setting deadlines for the discovery on MDI's two remaining claims [ECF No. 115].  Thereafter, in March 2025, the Court granted in part and denied in part the parties "untimely joint request" to extend discovery deadlines [ECF No. 117].  The Court warned: "There will be no further extensions" [ECF No. 117].

Aquila thereafter filed a motion for summary judgment, seeking judgment in its favor on MDI's two remaining claims [ECF Nos. 124, 125 ("Wood Aff."), 126 ("Def. 56.1"), 127 ("Simes Decl."), 128 ("Mem.")].  MDI filed an opposition, arguing that there are disputes as to fees Aquila allegedly owes MDI, the "calculation of 'Profit Participation Percentage,'" "whether Aquila has provided sufficient backup to audit the 'Profit Participation Percentage,'" and "the 'Confidential Information' claim" [ECF No. 131 ("Opp.") at 1, 17].  Aquila filed a reply [ECF Nos. 132 ("Def. Counter 56.1"), 133 ("Reply")].

### III.    LEGAL STANDARD

"Summary judgment should be granted if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Hachette Book Grp., Inc. v. Internet Archive*, 115 F.4th 163, 177 (2d Cir. 2024) (quoting Fed. R. Civ. P. 56(a)).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in

original). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* at 248. A material factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party bears the initial burden of showing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "[T]he movant's burden will be satisfied if [it] can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. Mar. of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). If the moving party satisfies its burden to demonstrate the absence of a dispute, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).

"The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252. Moreover, since "the purpose of summary judgment is to weed out cases" in which there are no issues for trial, "it is appropriate for district courts to decide questions regarding the admissibility of evidence on summary judgment." *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997); *see Nambiar v. Cent. Orthopedic Grp., LLP*, 158 F.4th 349, 364 (2d Cir. 2025) (explaining that only admissible evidence is considered on summary judgment; Fed. R. Civ. P. 56(c)(2). Further, a "district court deciding a summary judgment motion has broad discretion in choosing whether to admit evidence." *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009).

## IV.   ANALYSIS

Aquila clearly meets its initial burden to demonstrate that there are no genuine disputes of material fact and Aquila is entitled to judgment as a matter of law on MDI's only two remaining claims, which are "breach of the audit provision of the Services Agreement" and "breach of the

Interference with Business provision using confidential information." MTD Op. at 26; *see* Mem. at 12–14, 15–18. With respect to the audit, there is no dispute that, eventually, the parties mutually agreed to permit CBIZ to conduct an audit of Aquila's books and records. *See* Def. 56.1 ¶ 63; Pl. Counter 56.1 ¶ 63; Wood Aff. ¶ 42; CBIZ Status of Engagement Letter. There is further no dispute that "Aquila responded to [CBIZ's] information request, as modified" by the parties' agreement, "by providing spreadsheets, backup invoices, and explanations" for various payments, among other records. Def. 56.1 ¶ 66; Pl. Counter 56.1 ¶ 66; Simes Decl., Ex. 17; *see* Def. 56.1 ¶ 67; Simes Decl., Exs. 15, 17; CBIZ Status of Engagement Letter.

With respect to MDI's claim that Aquila breached the Interference with Business provision of the Services Agreement using confidential information, Aquila satisfies its burden by pointing out the absence of evidence to support essential elements of this claim. *See Goenaga*, 51 F.3d at 18. As discussed below, there is simply no evidence in the record before the Court that Aquila has ever used MDI's Confidential Information, as defined in the Services Agreement, to solicit any customer or financial partner of MDI in violation of the Services Agreement. Indeed, the Court struggles to follow MDI's arguments that this claim should survive, which are untethered from the language of the Services Agreement. As Aquila points out, it is undisputed that all Equipment and all records related to the Equipment "were owned solely by Aquila," Def. 56 ¶ 69; Pl. Counter 56.1 ¶ 69; *see* Wood Aff. ¶ 48, and, as such, neither the Equipment nor any records related to the Equipment are MDI's Confidential Information under the Services Agreement. Moreover, as far as MDI is concerned, "Confidential Information" is defined as "work product generated by [MDI] . . . in the performance of the Services," and, by the express terms of the Services Agreement, MDI granted Aquila "a worldwide, royalty-free, perpetual, irrevocable license to exploit" work by MDI that was integrated into Work Product for Aquila. Services Agreement §§ 5(a), 4(a), 4(b). In any

19

event, as Aquila points out, there is no evidence in the record that Aquila ever used MDI's Work Product "to solicit or otherwise provide services to a customer or financial partner of" MDI that is "in competition with the services provided by either party," as required to sustain a claim for breach of the provision. *Id.* § 6(b)(x).

As explained below, MDI fails "to come forward with specific evidence" in response to Aquila's motion "demonstrating the existence of a genuine dispute of material fact." *Brown*, 654 F.3d at 358. Instead, MDI devotes much of its opposition to arguments and purported evidence of unpaid invoices, which are immaterial because they relate only to dismissed claims. *See Anderson*, 477 U.S. at 247–48. With respect to the audit provision, MDI's entire argument is that, after discovery had closed and Aquila had filed its pending motion for summary judgment, MDI solicited and obtained from CBIZ a letter opining that Aquila has not provided enough information for the audit. In other words, MDI fails to come forward with any admissible evidence to raise a triable dispute. *See Nambiar*, 158 F.4th at 364; *Raskin*, 125 F.3d at 66. MDI similarly fails to offer more than a scintilla of evidence to sustain the elements of its claim that Aquila breached the Interference with Business provision of the Services Agreement using Confidential Information. *See Anderson*, 477 U.S. at 252.

### A. MDI's Principal Argument in Opposition to Summary Judgment Is an Improper Motion for Reconsideration of the Court's Earlier Opinion, Purports To Raise Immaterial Disputes, and Fails as a Matter of Law.

As explained above, MDI submits that Aquila has failed to pay fifteen purportedly "past due invoices." Opp. at 1, 6–7; *see* Pl. 56.1 ¶ 1(a)–(o); Keyes Decl. ¶¶ 3–5, 16; Invoice No. 269; Invoice No. 290; Invoice No. 303; Invoice No. 304; Invoice No. 307; Invoice No. 322; Invoice No. 332; Invoice No. 335; Invoice No. 336; Invoice No. 343; Invoice No. 344; Invoice No. 369; Invoice No. 377; Invoice No. 378; Invoice No. 386. According to MDI, these invoices are

evidence of Aquila's breaches of the Consultancy Fees provision of the Services Agreement "or, *more properly*," what MDI misleadingly calls the "other consulting services" provision, which provision MDI never mentions in its pleading and is now arguing, for the very first time on summary judgment, that Aquila has breached. Opp. at 7 (emphasis added). Aquila argues that all of MDI's claims for breaches of the fee provisions of the Services Agreement were dismissed more than a year ago. Mem. at 1. Furthermore, Aquila argues that it has either paid or "properly rejected as outside the scope of the Agreement" every invoice MDI has issued. *Id.* at 2; *see* Def. 56.1 ¶¶ 14–46; Wood Aff. ¶¶ 25, 26, 28, 29, 31; Simes Decl., Exs. 4, 9, 7, 11, 12.

### 1.   The Court Long Ago Dismissed any Claims for Breach of the Fee Provisions.

MDI argues that summary judgment is inappropriate because there are "disputes of material fact" as to its claim for breach of the Services Agreement based on the "past due invoices" MDI has identified. Opp. at 1, 13–14; *see* Pl. 56.1 ¶ 1(a)–(o). However, as explained above, the Court long ago dismissed any claim for breach contract based on any of the fee provisions of the Services Agreement. *See* MTD Op. at 17–20, 26. There is "no *genuine* issue of *material* fact" as to any of the invoices because none of MDI's arguments about those invoices can "affect the outcome of th[is] suit," which no longer includes any claims about alleged unpaid fees. *Anderson*, 477 U.S. at 247–48 (emphasis in original); *see* MTD Op. at 26.

In its brief in opposition to Aquila's motion for summary judgment, "MDI *concedes* that the Court's dismissal refers to [all] 'fee provisions.'" Opp. at 8. Despite this concession, MDI, nevertheless, implausibly asserts that the Court's earlier Opinion is "fairly" read to dismiss only MDI's claims for breach of the Monetization Fees and Profit Participation Percentages provisions of the Services Agreement. *Id.* Indeed, MDI asserts that "it is not at all clear that Aquila moved to dismiss as to all fees for outstanding invoices or that the Court intended to address" that

21

purportedly "un-raised issue." *Id.* at 19.  Furthermore, MDI asserts, "the Court can revisit [its] prior order at any time." *Id.*

The Court's earlier Opinion is clear.  The Court dismissed "MDI's claims for . . . breach of the fee provisions of the Services Agreement."  MTD Op. at 26.  As the Court explained at the time, the Amended Complaint is "opaque" about which fee provisions it alleges Aquila breached, which MDI now concedes is a "fair" description of its pleading.  *Id.*; Opp. at 8 & n.1.  As the Court noted in its Opinion dismissing MDI's breach of contract claim based on the fee provisions of the Services Agreement, MDI's failure to "identify the [fee] provisions" that were allegedly breached "itself" justifies dismissal for failure "to state a cause of action to recover damages for a breach of contract."  MTD Op. at 17 & n.5 (quoting *34-06 73, LLC v. Seneca Ins. Co.*, 39 N.Y.3d 44, 52, 198 N.E.3d 1282, 1287 (2022)).  In ruling on the motion to dismiss, the Court nevertheless proceeded to analyze whether MDI had stated a claim for breach of the Monetization Fees and Profit Participation Percentages provisions because, "[i]n its brief, MDI clarifie[d] that it claim[ed] Aquila owe[d]" MDI unpaid fees under only those specific provisions.  *Id.* at 18.  In other words, MDI long ago forfeited any argument that it was pressing claims for breaches of any other fee provisions.  *See Meyer v. Seidel*, 89 F.4th 117, 129 (2d Cir. 2023).

Furthermore, contrary to MDI's assertion in opposing summary judgment, there is absolutely no mystery about whether Aquila had "moved to dismiss as to all fees for outstanding invoices."  Opp. at 19.  MDI expressly moved to dismiss the Amended Complaint "in its entirety" [ECF No. 76 at 25].  MDI forfeited the claims it now seeks to revive, via an opposition to summary judgment, by previously failing to oppose dismissal of such claims when Aquila moved to dismiss the entire case at the pleading stage.  *See Scott v. JPMorgan Chase & Co.*, 2014 WL 338753, at *10 (S.D.N.Y. Jan. 30, 2014) (collecting cases ruling that a plaintiff waives or forfeits a claim by

22

failing to oppose dismissal at the pleading stage), *aff'd*, 603 F. App'x 33 (2d Cir. 2015); *see also Abrahams v. Young & Rubicam Inc.*, 79 F.3d 234, 237 (2d Cir. 1996).

There is similarly no ambiguity about whether the Court intended to dismiss supposedly "un-raised" fee provisions. *Id*. In its Opinion Granting in Part and Denying in Part the Motion To Dismiss, the Court thoroughly described all of the provisions of the Services Agreement that MDI had raised in its Amended Complaint. *See* MTD Op. at 2–4. The Court expressly analyzed the claims that MDI argued should survive dismissal, and MDI forfeited any claims that it failed to argue should survive dismissal, "with or without an explicit concession." *Meyer*, 89 F.4th at 128. As such, the Court proceeded to expressly and unambiguously dismiss all of "MDI's claims" for breach of any of "the fee provisions of the Services Agreement." *Id*. at 26.

In all events, MDI, the plaintiff in this case, never clearly alleged in its Amended Complaint that Aquila had breached the Consultancy Fees provision of the Services Agreement. *See* AC ¶ 33. MDI now concedes as much, blaming "predecessor counsel." Opp. at 8 & n.1. Similarly, the Amended Complaint contains no allegations whatsoever about what MDI now misleadingly calls the "other consulting services" provision.[12]

---

[12] Current counsel also laments that, "[i]n briefing on the motion to dismiss, it does not appear that either party cited the 'Survival of [sic] the Provisions' paragraph of the 'Services Agreement.'" Opp. at 20 n.6. According to new counsel, "[t]hat paragraph clearly states that the entirety of the 'fees' section 'survive[s] the termination of this Agreement,'" and "[w]hile the parties apparently previously argued the 'Services Agreement' is 'unambiguous,' . . . it frankly is quite ambiguous," given that other provisions "foreclose post-termination 'fees.'" *Id.* Let counsel rest assured that the Court carefully reviewed the Services Agreement before ruling on the Motion To Dismiss. The "Survival of Provisions" section of the Services Agreement states that the fee provisions "and all other provisions of this Agreement that by their nature extend beyond the termination of this Agreement . . . shall survive" the effective date of termination. Services Agreement § 16 (emphasis added). At the motion-to-dismiss stage, prior counsel for MDI "stresse[d]," and the Court understood and acknowledged, that "even after [MDI] was terminated, Aquila still had to pay 'obligations' that had 'accrued prior to the effective date of termination.'" MTD Op. at 19 (quoting ECF No. 78 at 22 and § 2(c)). That is all the Survival of Provisions Section means. The problem for MDI is that, in opposing the Motion To Dismiss, "MDI [did] not seek payment of obligations that accrued before it was terminated." *Id.* Rather, as the Court explained at the time, "MDI [sought] Monetization Fees and Profit Participation Percentages for post-termination sales and proceeds based on an untenable interpretation of the Services Agreement." *Id.* The Services Agreement, including the Survival of Provisions Section, "is unambiguous" on this score. *Id.* at 20.

The rulings this Court made based on pleadings and arguments prepared by predecessor counsel are law of the case. *See In re Peters*, 642 F.3d 381, 386 (2d Cir. 2011). The law-of-the-case doctrine "counsels a court against revisiting its prior rulings in subsequent stages of the same case absent cogent and compelling reasons, including, *inter alia*, the need to correct a clear error or prevent manifest injustice." *Id.* (internal quotation marks and citation omitted). MDI, which has never moved for reconsideration, falsely asserts that the Court is entirely free to "revisit" its "prior order at any time, with or without a motion for reconsideration." Opp. at 19. However, "where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again." *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) (quoting *Zdanok v. Glidden Co.*, 327 F.2d 944, 953 (2d Cir. 1964), *cert. denied*, 377 U.S. 934 (1964)). MDI's change in counsel is not a good reason for the Court to revisit its prior Opinion, and MDI has not identified any clear error or manifest injustice. *See Questrom v. Federated Dep't Stores, Inc.*, 192 F.R.D. 128, 131 (S.D.N.Y. 2000), *aff'd*, 2 F. App'x 81 (2d Cir. 2001); *Lopes v. First Unum Ins. Co.*, 2011 WL 13298876, at *2 (E.D.N.Y. Dec. 27, 2011) ("reconsideration is not the proper remedy where, as here, plaintiff has submitted no new facts or law but merely questions the effectiveness of [its prior] attorney's tactical decisions in the conduct of a litigation"). The Court rejects MDI's attempt to smuggle into its opposition to summary judgment an untimely and wholly unsupported request for reconsideration of the Court's Opinion and Order Granting in Part and Denying in Part the Motion To Dismiss.

Accordingly, because the Court long ago dismissed all of MDI's claims for breach of the fee provisions of the Services Agreement, MDI cannot reargue the issue of alleged unpaid fees to defeat Aquila's motion for summary judgment on MDI's remaining claims.[13]

## 2. Under the Unambiguous Terms of the Services Agreement, Aquila Properly Rejected the Allegedly Past Due Invoices.

According to MDI, all of the allegedly past due invoices "are for 'Consultancy Fees' or, *more properly*, 'other consulting services' under [Section 3(e)] the 'Services Agreement." Opp. at 7 (emphasis added). In a contract case, "if the court determines that 'the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms, and those terms may be the basis for summary judgment.'" *American Home Assur. Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 316 (2d Cir. 2006) (quoting *Dusé v. Int'l Bus. Machs. Corp.*, 252 F.3d 151, 158 (2d Cir. 2001)). Here, the terms of the Services Agreement are clear and unambiguous, which both parties have previously stipulated. *See* MTD Op. at 18; ECF No. 78 at 24. Applying the plain terms of the Services Agreement to the allegedly past due invoices MDI has identified, Aquila properly rejected the invoices as outside the scoped of the contract.

---

[13] In somewhat confusing fashion, MDI also appears to attempt to revive its dismissed claim for breach of the Profit Participation Percentage provision of the Services Agreement. In arguing that its purported claims for breach of the Consultancy Fees and "other consulting services" provisions of the Services Agreement survived the Court's earlier Opinion on the Motion To Dismiss, MDI stresses (indeed, literally highlights) that the Court expressly rejected its claim for breach of the Profit Participation provision. *See* Opp. at 9. Yet MDI nonetheless devotes much of its brief to the contention that it "is owed [money] for the 'Profit Participation Percentage.'" *Id*. at 14; *see id*. at 3–5, 14–17. In particular, MDI purports to offer evidence of a redline of an earlier draft of the Services Agreement, which MDI contends demonstrates that Aquila has improperly denied MDI money owed under Profit Participation provision. *See* Opp. at 3–5; Keyes Decl., Ex. B, Keyes Decl. ¶ 6. MDI also further contends that "the Court's prior ruling [dismissing MDI's claim for breach of the Profit Participation provision] would simply foreclose damages" under the provision for post-termination proceeds on the Equipment. *See* Opp. at 20 n.6. The Court dismissed MDI's claim for breach of the Profit Participation provision, and, as such, MDI cannot recover any damages in this lawsuit for breach of that provision. That is what it means for a claim to be dismissed. To be sure, in its earlier Opinion, the Court stressed that MDI could not collect a Profit Participation Percentage based on post-termination proceeds, but the Court stressed this point only because, in its pleading and opposition to the motion to dismiss, "MDI [did] not seek payment of obligations that accrued before it was terminated." MTD Op. at 19. Moreover, MDI cannot submit extrinsic evidence of the meaning of the Services Agreement, which MDI has previously acknowledged is unambiguous. *See Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 573 (2d Cir. 1993).

Only one of the invoices purports to be for the monthly Consultancy Fee set forth in Section 3(b) of the Services Agreement: "#369 for 'Monthly Consultancy Fee' dated November 18, 2022 for $5,000." Pl. 56.1 ¶ 1(l); Keyes Decl. ¶ 16(l); Invoice No. 369. Invoice Number 369 not only is dated more than a month after the October 14, 2022 effective date of termination of the Services Agreement, but also plainly bills Aquila for services "from October 19, 2022 – October 21, 2022." Invoice No. 369. However, MDI is not entitled under the Services Agreement to bill Aquila for a "Monthly Consultancy Fee" after the termination of the Services Agreement.

MDI acknowledges as much in the Amended Complaint, alleging only that Aquila would "remain[] obligated" to pay MDI only "any Consultancy Fees due under Section 2(c)," referring to a provision that requires Aquila to pay fees that had already accrued prior to the termination. AC ¶ 33. Specifically, Section 2(c) provides that "[u]pon the effective date of termination of th[e] Agreement, all legal obligations . . . including without limitation any Fees and expenses incurred after the effective date of termination, shall terminate," but Aquila remains obligated to pay fees that "accrued prior to the effective date of termination." Services Agreement § 2(c).[14] However, as noted above, Invoice Number 369 expressly purports to bill Aquila for services "after the effective date of termination." *Id.*; *see* Invoice No. 369. As such, even if the Court had not previously dismissed MDI's claims for breach of the fee provisions, Aquila is entitled to summary judgment on any claim that it breached the Services Agreement by failing to pay Invoice Number 369. *See American Home Assur. Co.*, 446 F.3d at 316; *Dusé*, 252 F.3d at 158.

---

[14] Section 2(c) also provides that "*at the request of* [Aquila]," MDI will continue to perform services and charge "the monthly Consultancy Fees" for a short "holdover period" after the effective date of termination. Services Agreement § 2(c) (emphasis added). However, there is no evidence in the record whatsoever that Aquila made such a request. In her Declaration, Keyes attests that some unspecified invoices "were for the completion of work shortly after the termination date *for the benefit of Aquila*." Keyes Decl. ¶ 17 (emphasis added). However, Section 2(c) simply does not authorize MDI to continue performing work for Aquila's supposed benefit after Aquila has terminated MDI, unless Aquila specifically "request[s]" that MDI do so. Services Agreement § 2(c). Because MDI has not offered an iota of evidence that Aquila ever made such a request, there can be no genuine dispute of material fact as to whether Aquila owes MDI monthly Consultancy Fees from any holdover period after the effective date of termination.

MDI contends that the remaining invoices it has identified fall into a purported catchall category of "other consulting services" under Section 3(e) of the Services Agreement. As noted above, the Amended Complaint is completely devoid of allegations that Aquila breached Section 3(e) of the Services Agreement, and MDI has never previously argued that Section 3(e) is pertinent to this case. This posture itself is sufficient reason to rule in favor of Aquila in connection with these invoices. *See Shah v. Helen Hayes Hosp.*, 252 F. App'x 364, 366 (2d Cir. 2007) ("A party may not use his or her opposition to a dispositive motion as a means to amend the complaint.") (citing *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (collecting cases); *Smith v. City of New York*, 385 F. Supp. 3d 323, 338 (S.D.N.Y. 2019) ("[I]t is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment.") (quoting *Beckman v. U.S. Postal Serv.*, 79 F. Supp. 2d 394, 407 (S.D.N.Y. 2000) (collecting cases)).

In any event, under the clear and unambiguous terms of the Services Agreement, MDI is not entitled to any fees under Section 3(e), which is set forth in full above. That Section begins with a condition precedent:

> *To the extent [Aquila] elects to subject a Batch 1 Airframe or a Batch 2 Airframe to a freighter conversion* for additional service capabilities *and requests that [MDI] provide oversight and management of such freighter conversion process*, [MDI] will be compensated according to [MDI's] customary rates (the "Conversion Fee").

Services Agreement § 3(e) (emphases added). Section 3(e) proceeds to list the "customary" flat rates MDI bills in connection with "a freighter conversion, C-Check or other consulting services." *Id.* However, Section 3(e) does not in any way suggest that MDI is going to provide, or Aquila is agreeing to pay, for *any* "C-Check or other consulting services." *Id.* On the contrary, after listing MDI's billing rates, Section 3(e) makes clear that it contemplates a freighter conversion only. It provides that Aquila and MDI will agree to "an estimate for *the total Conversion Fee*" before Aquila "contract[s] for a conversion slot." *Id.* It further provides that Aquila will "reimburse"

27

MDI for reasonable "expenses for its personnel associated with [MDI's] *conversion support*." *Id.* In other words, under the clear and unambiguous language of Section 3(e), MDI would be entitled to fees under Section 3(e) only if Aquila had "elect[ed] to subject" an airframe covered by the Services Agreement "to a freighter conversion" and "request[ed] that [MDI] provide oversight and management of such freighter conversion process." *Id.*; *see Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 690, 660 N.E.2d 415 (1995) (under New York law, a condition precedent "must occur before a duty to perform" arises).

It is undisputed that "Aquila never elected to subject an airframe covered by the Agreement to a freighter conversion." Wood Aff. ¶ 31; *see* Def. 56.1 ¶ 30; Pl. Counter 56.1 ¶ 30. MDI does not pretend that any of its invoices were related to a freighter conversion. *See* Def. 56.1 ¶¶ 29, 30; Pl. Counter 56.1 ¶¶ 29, 30. Instead, MDI pretends that the passing mention of "other consulting services" in Section 3(e), which notes that MDI customarily bills various flat rates when various personnel work on a freighter conversion and certain other consulting services, transforms Section 3(e) into a catchall provision that entitles MDI to issue one-off bills for consulting services on top of its monthly Consultancy Fee. *See* Opp. at 13–14. The plain language of Section 3(e) simply contradicts such a claim.

The Court also notes that a number of the allegedly past due invoices for purported "other consulting services" are clearly dated after the October 14, 2022 termination date. *See* Pl. 56.1 ¶ 1(j), (k), (m), (n), (o); Invoice No. 344; Invoice No. 343; Invoice No. 377; Invoice No. 378; Invoice No. 386. Furthermore, at least two invoices cannot possibly be bills pursuant to Section 3(e), which lists flat billing rates, because those invoices are calculated as a "5% Markup on" other items. *See* Pl. 56.1 ¶ 1(i), (n); Invoice No. 336; Invoice No. 378.

Accordingly, even if the Amended Complaint had asserted a claim for breach of Section

3(e), which it does not, and even if the Court had not previously dismissed all claims for breach of all fee provisions, which it has, MDI's attempt to proceed on a claim for unpaid invoices fails as a matter of law. *See American Home Assur. Co.*, 446 F.3d at 316; *Dusé*, 252 F.3d at 158.

**B.   Aquila Demonstrates that it has Complied with the Audit Provision, and MDI Fails To Offer Admissible Evidence that Aquila Breached It.**

Aquila seeks summary judgment on MDI's claim for breach of the audit provision of the Services Agreement. *See* Mem. at 1, 6, 12–14. As explained above, the Services Agreement provides that "[MDI] shall have the right no more than once per calendar year to engage a mutually agreed third party auditing firm to audit [Aquila's] books and records in respect of the Equipment at [MDI's] sole cost and expense." Services Agreement § 3(a). Aquila submits evidence that it has complied with the audit provision. Specifically, it submits undisputed evidence that, after protracted disagreements and litigation on the issue, "Aquila and MDI mutually agreed to use Marcum [later called CBIZ] to conduct the audit of Aquila's books and records." Def. 56.1 ¶ 63; Pl. Counter 56.1 ¶ 63; *see* Wood Aff. ¶ 42. It is also undisputed that Aquila responded to the Auditor's information request, as modified by mutual agreement of the parties, with pertinent records. Def. 56.1 ¶ 66; Pl. Counter 56.1 ¶ 66. Indeed, its voluminous responsive submissions are in the record before the Court. *See* Simes Decl., Exs. 7, 12, 17.

At this stage of the case, MDI's sole argument that Aquila has breached the audit provision is its own unsupported contention there is a dispute as to "whether Aquila has provided sufficient backup to audit the 'Profit Participation Percentage.'" Opp. at 1. MDI purports to offer in support of that contention a made-for-litigation letter from the Auditor. That letter, which is dated after Aquila filed its motion for summary judgment, states:

> As of the date of this letter we are unable to determine, within a reasonable degree of accounting certainty, the funds due MDI. This conclusion is due to the level of, and full disclosure of, documents required by Aquila has not been provided [sic].

29

CBIZ Status of Engagement Letter. Aquila objects that the Auditor's opinion is "undisclosed expert testimony and should be disregarded on summary judgment." Mem. at 14 n.1 (citing *GlobalRock Networks, Inc. v. MCI Commc'ns Servs., Inc.*, 943 F. Supp. 2d 320, 331 (N.D.N.Y. 2013) (rejecting plaintiff's effort "to introduce a new opinion from a previously unidentified expert" in an opposition to a motion for summary judgment). In its opposition, MDI acknowledges that the letter reflects the Auditor's "*opinion*." Opp. at 15 n.4 (emphasis added).

Aquila has satisfied its initial burden to demonstrate the absence of a genuine dispute of material fact as to whether it has complied with the audit provision of the Services Agreement. *Celotex*, 477 U.S. at 325. MDI has failed to respond with admissible evidence to demonstrate the existence of such a dispute. *See Brown*, 654 F.3d at 358; *Nambiar*, 158 F.4th at 364; Fed. R. Civ. P. 56(c)(2). Irrespective of whether the CBIZ Status of Engagement Letter is an undisclosed expert opinion, it is not evidence in the record before the Court. Discovery had closed and Aquila had already moved for summary judgment before MDI solicited and obtained the CBIZ Status of Engagement Letter [*see* ECF Nos. 115–117].

MDI handwaves Aquila's "gripe" that MDI "relie[s] on" documents in its opposition that it failed to produce in compliance with the Court's Orders and the Federal Rules. *Id.* at 16 n.5. According to MDI, its noncompliance is "of no moment." *Id.* The Court does not agree that MDI's noncompliance with the Court's Orders and the Federal Rules is "of no moment." *Id.*

As stated above, on summary judgment, only admissible evidence is can raise a genuine dispute of material fact, and the Court has "broad discretion in choosing whether to admit evidence." *Presbyterian Church of Sudan*, 582 F.3d at 264; *see Nambiar*, 158 F.4th at 364; *Raskin*, 125 F.3d at 66. The CBIZ Status of Engagement Letter is plainly untimely and is arguably

improper expert opinion evidence.[15]  MDI offers the Court no persuasive reason to admit that letter as evidence of a genuine dispute as to whether Aquila has breached the audit provision.  Rather, in support of its general argument that its discovery failures should be excused, MDI cites only one inapposite case in which a magistrate judge denied a plaintiff's motion for sanctions based on the defendant's failure to produce certain documents by the discovery deadline.  Opp. at 16 n.5 (citing *Recio v. D'Almonte Enters. Parking Garage, Inc.*, No. 22-cv-6153 (GS), 2025 WL 959351, at *1 (S.D.N.Y. Mar. 31, 2025)).

In any event, the bare assertion in a post hoc letter that "the level of, and full disclosure of, documents required by Aquila has not been provided" is too vague, conclusory, and unsupported to raise a genuine dispute of fact in the face of MDI's own admissions that Aquila had complied with the audit provision and Aquila's evidence of its compliance.  CBIZ Status of Engagement Letter; *see* Def. 56.1 ¶¶ 63, 66; Pl. Counter 56.1 ¶¶ 63, 66; Wood Aff. ¶¶ 42, 43; Simes Decl., Exs. 7, 12, 17.  Furthermore, it cannot go entirely unremarked that MDI has had years to complete this audit and, as it admits, MDI is clearly responsible for causing significant delay while Aquila was acting diligently to move the process forward.  *See* Keyes Decl. ¶ 8 (blaming "MDI's predecessor counsel" for a major source of delay); Def. 56.1 ¶¶ 55–61; Pl. Counter 56.1 ¶¶ 55–61.  There is no evidence of similar diligence by MDI, nor is there any evidence that CBIZ ever requested any additional information after Aquila provided the records that CBIZ (which is paid by MDI) now asserts, in wholly conclusory fashion, were not sufficient for CBIZ to perform the work for which

---

[15] The Federal Rules of Civil Procedure require timely disclosure of expert opinions and the basis for those opinions. *See* Fed. R. Civ. P. 26(a)(2)(B)(i).  MDI does not contend that it timely designated the Auditor as an expert and disclosed the basis for the Auditor's opinion that Aquila is to blame for the failure of the audit, and the letter plainly does not provide any explanation of the basis for the Auditor's opinion.  *See* Opp. at 15 n.4.  Rather, MDI simply asserts, without support, that Aquila had some notice of MDI's intention to offer the Auditor's opinion and that "[a]ny layperson can see that backup was not provided," or, at least, "is not easily found" among the records Aquila submitted. *Id.*  As noted above, MDI concedes that the letter reflects the Auditor's "opinion."  *Id.*  The Court need not rule definitively on the nature of this evidence, however, since, as stated above, the CBIZ Status of Engagement Letter is not evidence in the record at all.

it was retained. Accordingly, because Aquila offers ample evidence of its compliance with the audit provision of the Services Agreement, and MDI offers no admissible evidence that Aquila has breached, Aquila is entitled to summary judgment dismissing MDI's claim for breach of the audit provision of the Services Agreement.

C. **There Is No Evidence in the Record To Sustain Elements of MDI's Claim that Aquila Breached the Interference with Business Provision Using Confidential Information.**

MDI's sole remaining claim is that Aquila breached Section 6(b)(x) of the Services Agreement by using "Confidential Information to solicit or otherwise provide services to a customer or financial partner" of MDI. Services Agreement § 6(b)(x). MDI seems to argue that Aquila has breached this provision in two ways. First, MDI seems to contend that Aquila acted improperly by selling aircraft assets to Turbo Resources. *See* Opp. at 18. Second, MDI contends that MDI breached the Services Agreement by "parroting MDI's 'Work Product' for 'customers and financial partners' that the two shared." Opp. at 12 (citing Pl. Counter 56.1 ¶¶ 75, 78, 85, 154). Neither of MDI's unsupported contentions warrants denying Aquila's motion for summary judgment dismissing the claim.

As outlined above, Section 6(b)(x) of the Services Agreement provides that "neither party shall use any Confidential Information to solicit or otherwise provide services to a customer or financial partner of the other party, that are in competition with the services provided by either party." Services Agreement § 6(b)(x). Confidential Information is defined as (1) Work Product "generated by [MDI] solely or jointly with others, specifically in the performance of the Services," and (2) any information either related to the Equipment, or "provided by" *Aquila* and its affiliates "to [*MDI*]." Services Agreement §§ 5(a), 4(a) (emphasis added). As MDI admits, Aquila "solely" owned the information related to the Equipment. Def. 56.1 ¶ 69; Pl. Counter 56.1 ¶ 69. In other words, the only Confidential Information, as defined in the Services Agreement, that might belong

32

to MDI was "Work Product." Services Agreement § 5(a). However, the section that defines Work Product expressly provides: "In the event that [MDI] integrates any work that was previously created by [MDI] into any Work Product, [MDI] shall grant to, and [Aquila] is hereby granted, a worldwide, royalty-free, perpetual, irrevocable license to exploit the incorporated item." *Id.* § 4(b). Thus, read in context, the provisions of the Services Agreement related to Confidential Information and Work Product principally protect Aquila. *See Id.* § 5(b) (proving that **MDI** only "will not, except as required by law or court order, use the Confidential Information for any purpose whatever other than the performance of the Services . . . ."); *Morgan Stanley Grp. Inc. v. New England Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000) (holding that contract language must be "examined [in] the context of the entire integrated agreement"). Nevertheless, as stated above, the Services Agreement prohibits Aquila from using MDI's Confidential Information "to solicit" or "provide services" to "a customer or financial partner" of MDI if that entity is "in competition with" either MDI or Aquila. Services Agreement § 6(b)(x).

The Court struggles to follow MDI's argument that Aquila's sale of aircraft assets to Turbo Resources, after Aquila had terminated its relationship with MDI, violates Section 6(b)(x). MDI writes:

> No one is arguing that Aquila could not sell the assets post-termination, but Aquila was not permitted to piggyback on MDI's existing relationships to do so. It had to sell (or lease) to a partner that did not come through MDI.

Opp. at 18. However, nothing in the text of the relevant provisions can be construed to impose a blanket prohibition on Aquila ever selling aircraft assets to any company with whom MDI had a relationship. Rather, to sustain its claim, MDI would have to show that Aquila used MDI's Confidential Information, as defined in the Services Agreement, to solicit or provide services to "a customer or financial partner" of MDI that also competes with MDI or with Aquila.

33

Services Agreement § 6(b)(x).  MDI has not identified any Confidential Information that Aquila allegedly used to solicit or otherwise provide services to Turbo Resources.  Insofar as MDI contends that its supposed relationship with Turbo Resources is itself Confidential Information, that contention is untenable.

For MDI's purposes, Confidential Information is limited to "work product" that MDI "generated . . . specifically in the performance of services for Aquila."  Services Agreement § 4(a) (defining "Work Product"); *see id.* § 5(a).  The other categories of Confidential Information belong to Aquila.  *See* Def. 56.1 ¶ 69; Pl. Counter 56.1 ¶ 69.  In particular, MDI admits that all Equipment and records related to the Equipment belong to Aquila. *See* Def. 56.1 ¶ 69; Pl. Counter 56.1 ¶ 69. MDI does not offer any argument or evidence that the mere existence of its supposed relationship with Turbo Resources meets the definition of Work Product.  The only evidence MDI submits is that it once received an email inquiry from the CEO of Turbo Resources introducing his company and expressing interest in "the 757 airframes."  Turbo Emails at 1.  MDI offers no evidence that MDI "generated" this communication, or that it occurred "specifically in the performance of services for Aquila."  Services Agreement § 4(a).  As such, the communication does not meet the definition of Work Product, and MDI simply has not identified any Confidential Information at issue in connection with Aquila's sale to Turbo Resources.

Indeed, MDI fails to submit more than a scintilla of evidence to support its contention that Aquila's sale to Turbo Resources "piggyback[ed]" on MDI's supposed relationship with Turbo Resources.  Opp. at 18.  To prevail on its claim that Aquila breached Section 6(b)(x), MDI must establish that Turbo Resources was "a customer or financial partner" of MDI.  Services Agreement § 6(b)(x).  MDI's evidence of a single email inquiry *from* the CEO of Turbo Resources, which itself makes clear that there was no relationship between MDI and Turbo Resources prior to that

email, falls far short of establishing that Turbo Resources was ever a customer or financial partner. *See* Turbo Resources Email at 1–2; Services Agreement § 6(b)(x).  MDI offers no further evidence of its supposed relationship with Turbo Resources.  MDI offers no evidence whatsoever that Aquila learned of, or connected with, Turbo Resources through MDI.

Rather, MDI asserts that "Aquila presents no evidence that it had any equal predecessor relationship with Turbo Resource."  Opp. at 18.  However, where, as here, the non-movant has the burden of proof to establish a claim, the movant can prevail on summary judgment by pointing out the absence of evidence of to support essential elements of the claim. *Goenaga*, 51 F.3d at 18.  As Aquila points out, MDI has not offered evidence to sustain the elements of its claim that Aquila breached Section 6(b)(x). *See id.*  For example, MDI offers no evidence that Aquila used MDI's Confidential Information in any transaction with Turbo Resources.  Despite MDI's effort to shift the burden of proof, Aquila is not required to present evidence that it had a preexisting relationship with Turbo Resources where its sale to Turbo Resources clearly falls outside the scope of Section 6(b)(x).  Moreover, MDI offers only dubious evidence of its own supposed relationship with Turbo Resources, and, as MDI admits, members of Aquila "have worked with virtually every major player in the aviation industry."  Pl. Counter 56.1 ¶ 4; Def. 56.1 ¶ 4

MDI's final contention in support of its effort to avoid summary judgment is that Aquila has "parrot[ed] MDI's 'Work Product' for 'customers and financial partners' that the two shared." Opp. at 12 (citing Pl. Counter 56.1 ¶¶ 75, 78, 85, 154).  In particular, MDI submits that it inserted "technical language" into a GTA with Delta, which "governed the lease of an engine from which Aquila earned a return," and Aquila's later GTA with Delta contains the same technical language. *Id.*; Keyes Decl. ¶ 10; *see* Keyes Decl., Exs. D, E; Simes Decl., Ex. 22.  As an initial matter, the section of the Services Agreement that defines Work Product expressly provides that MDI grants

35

Aquila "a worldwide, royalty-free, perpetual, irrevocable license to exploit" work previously created by MDI if it was integrated into Work Product for Aquila.  Services Agreement § 4(b).  Moreover, MDI offers no evidence or argument that Aquila used the "technical language" in the GTA "to solicit or otherwise provide services to" Delta.  Services Agreement § 6(b)(x).  MDI likewise offers no evidence or argument whatsoever to support an inference that Delta, a major international airline, is "in competition with the services provided by either" MDI or Aquila, a "boutique" consulting company and "finance platform" in the aviation industry, respectively.  Def. 56.1 ¶¶ 1, 2, 7; Pl. Counter 56.1 ¶¶ 1, 2, 7.

The Court has carefully reviewed MDI's purported other examples of Aquila using its Work Product, which MDI itself does not bother to discuss in its brief.  *See* Opp. at 12.  In most instances, the purported Work Product clearly, on its face, was not "generated" by MDI.  Services Agreement § 4(a); *see* Def. 56.1 ¶¶ 73, 75, 80, 85; Pl. Counter 56.1 ¶¶ 73, 75, 80, 85.  MDI simply fails to offer more than a scintilla of evidence that Aquila breached Section 6(b)(x) of the Services Agreement, and, in the absence of such evidence and under the plain language of the Service Agreement, Aquila is entitled to judgment as a matter of law.  Accordingly, Aquila's motion for summary judgment dismissing MDI's claim for breach of the Interference with Business provision using Confidential Information.  *See Anderson*, 477 U.S. at 252.

## V.    CONCLUSION

For the reasons set forth above, Aquila's motion for summary judgment [ECF No. 124] is GRANTED.  Aquila's request for oral argument in connection with that motion [ECF No. 134] is DENIED as moot.

The Clerk of Court respectfully is requested to terminate the motions pending at docket entries 124 and 134, enter judgment in favor of Defendant Aquila Air Capital (Ireland) DAC, and to close this case.

**SO ORDERED.**

**Date:  March 17, 2026**
       **New York, NY**
                                      **MARY KAY VYSKOCIL**
                                        **United States District Judge**